UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

(Alexandria Division)


- - - - - - - - - - - - - - - x

                                    :

In re:                      :  Case No. 10-16505-RGM

                                    :

RMAA REAL ESTATE HOLDINGS,   :  (Chapter 11)

                                    :

L.L.C.,                     :

                                    :

        Debtor.         :

                                    :

- - - - - - - - - - - - - - - x


               Wednesday, August 11, 2010

               U.S. Bankruptcy Court

               Alexandria, Virginia


     The above-entitled matter came on to be heard

before THE HONORABLE ROBERT G. MAYER, Judge in and for

the United States Bankruptcy Court, 200 South

Washington Street, for the Eastern District of

Virginia, Alexandria Division, beginning at 12:28 p.m.

Diversified Reporting Services, Inc.

(202) 467-9200

APPEARANCES:

On behalf of the Debtor:

    JOHN P. FOREST, ESQUIRE

    Allred Bacon Halfhill & Young, PC

    11350 Random Hills Road, Suite 700

    Fairfax, Virginia  22030

    (703) 352-1300

On behalf of the Creditor Access National Bank:

    KEVIN M. O'DONNELL, ESQUIRE

    JEFFERY T. MARTIN, ESQUIRE

    Henry O'Donnell Dahnke & Walther, PC

    4103 Chain Bridge Road, Suite 100

    Fairfax, Virginia  22030

    (703) 273-6884

Page 3

C O N T E N T S

| WITNESS: | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| Daniel Harvill | 11 | 50 | 54 |
| Robert Shoemaker | 58 | 76 | -- |
| Gilbert Rogers | 86 | -- | -- |
| Brett Amendola | 92 | 117 | -- |

E X H I B I T S

RECEIVED

| | |
|---|---|
| Movant's Exhibit No. 1 - Promissory Note Between borrowers and Access National Bank | 60 |
| Movant's Exhibit No. 2 - Deed of Trust of Access National Bank securing Construction Loan Rider | -- |
| Movant's Exhibit No. 3 - Payoff Statement Of Access National Bank, 8/4/10 | 38 |
| Movant's Exhibit No. 4 - Second Deed of Trust for $1,000,000 | -- |
| Movant's Exhibit No. 5 - Payoff Statement From Warren R. Stein | -- |
| Movant's Exhibit No. 6 - Copies of Recorded Liens on Title | 34 |
| Movant's Exhibit No. 7 - Appraisal by G. Rogers, 8/6/10 | -- |
| Movant's Exhibit No. 8 - Notice of Trustee Sale on 5/8/09 | 16 |

Page 4

E X H I B I T S (Continued)

RECEIVED

Movant's Exhibit No. 9 - U.S. Bankruptcy
Court docket containing case of Janet
Amendola, item 26                               16
Movant's Exhibit No. 10 - Lift Stay Order
Of U.S. Bankruptcy Court re: Janet Amendola     17


Movant's Exhibit No. 11 - Notice of
Substitute Trustee Sale on 7/17/09              19
Movant's Exhibit No. 12 - U.S. Bankruptcy
Court docket containing case of Brevon
Developers, Inc.                                20
Movant's Exhibit No. 13 - Fax from Azarcon
To Harvill re: Trustee sale on 7/17/09          58


Movant's Exhibit No. 14 - Notice of
Substitute Trustee Sale on 7/31/09              22
Movant's Exhibit No. 15 - U.S. Bankruptcy
Court docket containing case of Roger
Amendola, item 19                               23
Movant's Exhibit No. 16 - Notice of
Substitute Trustee Sale on 10/5/09              25


Movant's Exhibit No. 17 - Forbearance
Agreement                                       64
Movant's Exhibit No. 18 - Operating
Agreement for RMAA Real Estate                  68


Movant's Exhibit No. 19 - Deed to RMAA          50


Movant's Exhibit No. 20 - Notice of
Substitute Trustee Sale on 5/24/10              28


Movant's Exhibit No. 21 - Notice of
Substitute Trustee Sale on 6/23/10              28

E X H I B I T S (Continued)

RECEIVED

Movant's Exhibit No. 22 - Involuntary

Bankruptcy Petition by RMAA, 6/22/10                    28


Movant's Exhibit No. 23 - Notice of

Substitute Trustee Sale on 8/3/10                      30


Movant's Exhibit No. 24 - Involuntary

Bankruptcy Petition by RMAA, 8/3/10                    30


Movant's Exhibit No. 25 - Judge

Mitchell's Order of Dismissal of

Involuntary Petition by RMAA                           29


Defendant's Exhibit A - Contract            80, 101


Defendant's Exhibit B - Statement

Of Brett Amendola                                     117

1                    P R O C E E D I N G S

2            MR. O'DONNELL:  Good afternoon, Your Honor,

3    Kevin O'Donnell and Jeff Martin on behalf of Access

4    National Bank and I have my client's representative

5    Robert Shoemaker present with me today.

6            MR. FOREST:  Good morning, Your Honor, John

7    Forest for the petitioning Creditors.  Present with me

8    is Brett Amendola, one of the petitioning Creditors.

9            THE COURT:  How much time do you all expect

10   you need?

11           MR. O'DONNELL:  Your Honor, it's over an hour.

12   It might be 90 minutes, would be my guess.  I have

13   three witnesses.  I'm going to run through them quickly

14   but I have exhibits that I want to present to the Court

15   because this involves a history of conduct --

16           THE COURT:  That's fine.  I just needed an

17   estimate.  Do you agree with that or?

18           MR. FOREST:  Well, I understand that, Your

19   Honor.  The difficulty I have -- I shouldn't say the

20   difficulty -- the one question I have is what exactly

21   are we going to be addressing today?

22           I gathered from Mr. O'Donnell's comments that

23   he wants to have the preliminary and the final hearing.

24   My particular concern is that we've had some difficulty

25   getting an appraisal of the property.

1           I would just make a proffer to the Court that

2    we have an appraisal that is one year old.  We don't

3    have the appraisal here that shows the property being

4    worth $5.2 million.

5           We have a contract that was entered into and

6    ratified, I believe in late April.

7           THE COURT:  Understood.  I read your papers.

8    What is the debt on the property?

9           MR. FOREST:  The debt is around 2.1 and some

10   change, might be 2.2.

11          MR. O'DONNELL:  That's entirely incorrect,

12   Your Honor.  Mr. Forest --

13          THE COURT:  I don't need you to argue it.

14   What's your view of the debt?

15          MR. O'DONNELL:  The debt to my client is

16   approximately $2.3 million, slightly under that,

17   $2.25 --

18          THE COURT:  Is there a subordinate?

19          MR. O'DONNELL:  And there is a second trust on

20   the property that has a principal amount owed of

21   $1,000,000 and the last payoff we had from them was in

22   excess of $4,000,000.  That payoff came approximately

23   60 days ago.

24          THE COURT:  That's quite a --

25          MR. O'DONNELL:  It was a hard money loan, Your

Page 8

1    Honor, that accrued interest at five percent per month.

2    It has not been serviced.  It has accrued since it

3    originated --

4         THE COURT:  All right, so your view is that,

5    if you take the papers at their face value it's over

6    $5,000,000 -- actually over $6,000,000?

7         MR. O'DONNELL:  That's correct, and we have

8    valuation testimony that would substantially alter Mr.

9    Forest's representation.

10        There are also, Your Honor, and we believe

11   more importantly alternative grounds for relief other

12   than (D)(2) we filed under (D)(1) for cause including

13   bad faith filing and most importantly under (D)(4), 362

14   because we believe that this filing and represented

15   that this filing was part of a pattern of conduct meant

16   to delay, hinder, or defraud access that involved prior

17   filings with respect to this property.

18        THE COURT:  What I want to do is go to lunch

19   because, especially if you're going to be an hour and a

20   half I don't want to break you in the middle of that.

21   I think it's better for the presentation to do the

22   whole thing from beginning to end.

23        I've got a matter also at 2:00.  I don't know

24   how long that's going to take but I think I can

25   accommodate both of you today.  It's just a question,

1   are you involved in that?

2            MR. MARTIN:  Yes, Your Honor, the matter at

3   2:00 is my matter for a separate client.  I anticipate

4   that that will take, optimistically an hour, possibly

5   an hour and a half.

6            THE COURT:  So I think I can get you both in.

7            MR. O'DONNELL:  Let me address one thing.  My

8   first witness, Your Honor, is an attorney and member of

9   the bar Daniel Harvill.  I expect he will take upwards

10  of 30 minutes.  He had a prior commitment and was

11  supposed to be on the road towards that by about 1:30.     I

12  know we don't like to split this up and that's not my

13  desire to do so but I wonder if we could put him on the

14  stand now and take his testimony.

15           THE COURT:  Where is the commitment?

16           THE WITNESS:  I have a meeting in Vienna at

17  2:00 for trial preparation.

18           THE COURT:  For tomorrow's trial?

19           THE WITNESS:  Yes.

20           THE COURT:  All right, we can do that.  We can

21  just push the 2:00 back to a little later than that.

22           MR. O'DONNELL:  I told Mr. Martin that I had

23  seniority today and that his matter would be below mine

24  on the docket no matter what happened so he's already

25  been advised of that, Your Honor.  He's okay with it.

1          MR. FOREST:  Your Honor, I have a matter at

2     1:30 with Judge Mitchell.  It was a contested

3     confirmation hearing and he's going to be --

4          THE COURT:  How long is that going to take?

5          MR. FOREST:  I wanted to say that he's going

6     to be issuing his ruling so I want to bring that to the

7     Court's attention but I can't imagine that's going to

8     materially interfere.

9          THE COURT:  You need to be down there at 1:30.

10    We'll go to 1:00 and we'll take lunch or something and

11    you can be downstairs at 1:30.  I don't see that as a

12    conflict on that.

13         As far as this goes this is a motion for

14    relief from stay.  It is a preliminary hearing and we

15    need to proceed on that.

16         You may get final relief based on the type of

17    the testimony and the gravity of it but because it's

18    also on an expedited if it appears that there may be

19    need for additional time to prepare.

20         I'd take that into account so be prepared to

21    argue your entire case as best you can because I may

22    combine it with the final depending on what I find, or

23    I may not if it would be unfair on an expedited basis

24    to do that.

25         I don't know the evidence so I can't tell you.

1          MR. O'DONNELL:  I understand, Your Honor.

2          THE COURT:  But if you're prepared to go

3   forward let's take the first witness.  We'll take a

4   break after that and then we'll come back and figure

5   out what we want to do on the rest of them.

6          All right, do you have some exhibits here?

7          MR. O'DONNELL:  Your Honor, I do.  I have two

8   copies for the Court and the witness.  These are two

9   separate copies.  Your Honor, I will reserve our

10  argument for final in order to be able to get this

11  moving.  I call Daniel Harvill.

12         THE COURT:  All right, Mr. Harvill, will you

13  come forward, please?  Come to the Clerk's desk to be

14  sworn.

15         Whereupon,

16                   DANIEL HARVILL

17         was called as a witness on behalf of the

18  Creditor and, having been first duly sworn, was

19  examined and testified as follows:

20                 DIRECT EXAMINATION

21         BY MR. O'DONNELL:

22     **Q     State your name and address, please.**

23     A     Daniel Harvill; one of my office addresses is

24  2740 Chain Bridge Road, Vienna, Virginia  22181.  My

25  other office address is 9403 Grant Avenue, Suite 202,

Page 12

1   Manassas, Virginia  20110.

2        **Q     And your occupation, Mr. Harvill?**

3        A    I'm an Attorney practicing in Virginia and

4   Maryland.

5        **Q     When were you admitted to practice in**

6   **Virginia?**

7        A    Admitted to Virginia in 2003, admitted to

8   Maryland in 2003.

9        **Q     Describe generally the nature of your**

10  **practice?**

11       A    I have a general practice but I focus very

12  heavily on real estate, real estate litigation, real

13  estate transactions, real estate foreclosures,

14  foreclosure defense of those litigating, real estate on

15  behalf of borrowers.

16            I also do other areas of law as well.

17       **Q     Did there come a time when you were engaged by**

18  **Access National Bank with respect to real property**

19  **located at 18688 Riverlook Court in Leesburg, Virginia?**

20       A    I was engaged by Access National Bank to act

21  as the Trustee for the foreclosure of that property.

22       **Q     Would you describe the circumstances and the**

23  **requirements of that engagement?**

24       A    The engagement, I believe it was entered into

25  in December 2008.  The file was transferred to me for

Page 13

1    review.  I reviewed it, came up with any red flags,

2    ordered the title search.

3            The nature of the engagement between Access

4    National Bank and I as far as compensation is either an

5    hourly or if the sale price is sufficient to have a

6    commission.

7        **Q    You were instructed to commence foreclosure**

8    **proceedings, right?**

9        A    I was.

10       **Q    And would you tell me briefly the steps that**

11   **you take in preparation for commencement of that**

12   **foreclosure?**

13       A    First you make sure the bank has an original

14   of the promissory note.  You also have, you want to get

15   a soldiers and sailors affidavit and make sure that the

16   borrower is not a member of the armed services.

17           You do a title search, of course, review the

18   title, look for any liens' issues.  You need the title

19   search both to provide notices to the junior lien

20   holders as well as to ensure that you know the status

21   of title, see if there are any superior liens to your

22   lien, and whether those have to be taken into account.

23           And then from there you send notices to the

24   borrowers under the Fair Debt Collection Practices Act

25   and then also from there you have notices required

Page 14

1   under Virginia law for the actual foreclosure sale

2   itself.

3       **Q     And you undertook all of those actions with**

4   **respect to the potential foreclosure or proposed**

5   **foreclosure of this property?**

6       A    I did.

7       **Q     And when I refer to the "property" I am**

8   **referring specifically to 18688 Riverlook Court; do you**

9   **understand that?**

10      A    Yes, sir, that's the property.

11      **Q     Very good.  You have a set of exhibits in**

12  **front of you.  I would ask you briefly to open that and**

13  **turn to Exhibit number eight.**

14      A    I have it.

15      **Q     Can you describe that exhibit to the Court?**

16      A    That was the notice of Trustee sale from May

17  8th, 2009 at 3:45 on this property.

18      **Q     And what that in fact the first attempt to**

19  **foreclose on this property?**

20      A    It was not the first attempt.  There had been

21  a previous foreclosure scheduled but there had been a

22  work-out between the bank and the borrower.  This is

23  the first one that was going to go forward.

24      **Q     Did it in fact go forward on May 8th of 2009?**

25      A    It did not.

Page 15

1      **Q      Can you tell me why not?**

2      A      I received information that Janet Amendola,

3      one of the title holders at that time had declared

4      bankruptcy.

5      **Q      And so that I'm clear, at this point in time**

6      **in May of 2009 who were the title holders of the**

7      **property?**

8      A      Roger Amendola and Maureen Amendola, husband

9      and wife as to 50 percent, Janet Amendola and Brett

10     Amendola, husband and wife as the other 50 percent and

11     that's by the entirety in their each respective shares.

12     **Q      And how are Brett and Janet related to Roger**

13     **and Maureen to the best of your knowledge?**

14     A      My understanding is that Roger Amendola is the

15     father of Brett Amendola and the father-in-law of Janet

16     Amendola, and obviously Maureen Amendola is Roger

17     Amendola's wife.

18     **Q      You say that this sale was stayed by virtue of**

19     **filing a bankruptcy by Janet Amendola?**

20     A      That is correct.

21          MR. O'DONNELL:  Your Honor, move Exhibit

22     number eight.

23          MR. FOREST:  Your Honor, I don't have an

24     Exhibit eight but if the testimony was the Trustee sent

25     notice I don't object to that evidence.

1              MR. O'DONNELL:  No, Your Honor, I'll give Mr.

2    Forest my copy.  I apologize.  I had these copied last

3    night and that's, if you want to put that in your book.

4              And Your Honor, if the Court will, Exhibit

5    number nine is the docket report for the bankruptcy

6    case of Janet Amendola, case number 09-13498 filed on

7    May 4th of 2009.

8              I would ask the Court to admit that by

9    judicial notice as Exhibit nine.

10             THE COURT:  Any objection to nine?

11             MR. FOREST:  No objection, Your Honor.

12             THE COURT:  Eight and nine are both received.

13                              (The items referenced above,

14                               previously marked for

15                               identification as Movant's

16                               Exhibit Nos. 8 and 9, were

17                               received into evidence.)

18             MR. O'DONNELL:  Thank you, Your Honor.  I

19   would point out that Exhibit nine identifies the docket

20   entry 26 that the Court, this Court entered an order

21   lifting the stay as to the property on behalf of Access

22   National Bank on the case of Janet Amendola.

23             And Your Honor, item number 10 or Exhibit

24   number 10 is a copy of that order as printed from the

25   Court's docket and I move the admission of that by

Page 17

1   judicial notice.

2              THE COURT:  Any objection to 10?

3              MR. FOREST:  No, Your Honor.

4              THE COURT:  All right, 10 is admitted.

5                              (The item referenced above,

6                              previously marked for

7                              identification as Exhibit

8                              No. 10, was received into

9                              evidence.)

10             MR. O'DONNELL:  Thank you.

11             BY MR. O'DONNELL:

12     **Q**     **Mr. Harvill, have you seen Exhibit number 10?**

13     A     I have.  I received that after the order was

14   granted.  I got a copy of it.

15     **Q**     **And in what context did you come to be in**

16   **possession of a copy?**

17     A     The reason would be to move forward with the

18   foreclosure since the stay had been lifted.

19     **Q**     **And in fact were those your instructions?**

20     A     They were.

21     **Q**     **Did you in fact move forward to commence or**

22   **advertise yet another foreclosure?**

23     A     I did.

24     **Q**     **And would you look at Exhibit number 11,**

25   **please?  Can you tell the Court what that is?**

Page 18

1      A      That is a notice of substitute Trustee sale

2    for the property setting the sale for July 17th, 2009

3    at three p.m.

4         **Q      And in fact did that sale go off as scheduled?**

5      A      It did not.

6         **Q      Can you tell me why not?**

7      A      There was a bankruptcy filing by Brevon

8    Developers, Incorporated.

9         **Q      Will you tell the Court please, what is Brevon**

10    **Developers, Incorporated?**

11      A      My understanding was Brevon Developers,

12    Incorporated was a company owned by Roger Amendola and

13    had a relationship with Brett Amendola and I was

14    notified of the filing and so I, basically I was

15    notified of the filing by a fax and an angry phone call

16    from the law office of Januario Azarcon who said he was

17    representing Brevon Developers, Inc.

18         **Q      And you understand Brevon Developers, Inc. to**

19    **have also been a guarantor of the obligation owed to**

20    **Access National Bank?**

21      A      That is correct.  They had signed on to some

22    of the guarantee documents related to the debt.

23         **Q      But at least with respect to the original**

24    **title documents Brevon was not a title owner at the**

25    **point in time that you reviewed title, is that fair to**

Page 19

1    **say?**

2         A    That is correct.  They were not a title holder

3    though I knew that they were a company controlled by

4    Roger so I did have some concerns that perhaps there

5    had been a last minute deed filing since my bring-down,

6    that the property may have been transferred into

7    Brevon's name.

8              And basically what I did is I, out of an

9    abundance of caution I put a hold on the sales to

10   figure out what exactly had happened.

11             MR. O'DONNELL:  Your Honor, move Exhibit 11.

12             THE COURT:  All right, 11 is admitted.

13                              (The item referenced above,

14                               previously marked for

15                               identification as Movant's

16                               Exhibit No. 11, was received

17                               into evidence.)

18             MR. O'DONNELL:  Your Honor, Exhibit 12 is the

19   bankruptcy docket sheet printed from this Court's

20   docket for Brevon Developers, Inc., case number

21   09-15677 that was a case before you.  Move that by

22   judicial notice.

23             THE COURT:  Any objection?

24             MR. FOREST:  None, Your Honor.

25             THE COURT:  Twelve is received.

Page 20

1              (The item referenced above,

2              previously marked for

3              identification as Movant's

4              Exhibit No. 12, was received

5              into evidence.)

6         MR. O'DONNELL:  Thank you, Your Honor.  I

7    would point out that the docket report indicates that

8    the case was dismissed for failure to file schedules.

9         BY MR. O'DONNELL:

10        **Q    Would you look at Exhibit 13, Mr. Harvill, and**

11   **describe that exhibit?**

12        A    This appears to be the fax I received from Mr.

13   Azarcon's office concerning the bankruptcy of Brevon.

14        **Q    And this was delivered to you prior to the**

15   **foreclosure sale that was scheduled for that date?**

16        A    It was.

17        **Q    What does it tell you with respect to that**

18   **foreclosure sale?**

19        A    It says, "please stop all foreclosure sale

20   actions to the above property immediately."

21        **Q    You indicated a moment ago that you received a**

22   **call.  Would you describe what the nature of that call**

23   **was?**

24        A    There was a call from a paralegal with Mr.

25   Azarcon's office saying that this bankruptcy had been

Page 21

1    filed.  I checked Pacer which is the way we usually

2    double check to see if anything was filed.

3            I could not find the filing in Pacer.  I told

4    him that if I didn't have notice or copies of

5    something, if I couldn't confirm what was on this fax I

6    would pursue the sale and that person became very angry

7    and threatening towards me and I don't remember the

8    exact words.

9            I just remember it was a very threatening

10   phone call so I did some more checking and got some

11   copies and halted the sale.

12   **Q    What effect did this particular fax have upon**

13   **your decision to halt the sale?**

14   A    Basically it got me checking.  It got me

15   checking to see if there was a bankruptcy filing and

16   basically what I was very concerned about was that

17   there might have been some kind of deeding of the

18   property at the last minute.

19           I was very concerned with the fact that they

20   were the guarantor and better safe than sorry.  I did

21   not want to step on the Court's stay if it did take

22   effect so I basically postponed the sale at that point

23   to get more information.

24   **Q    Did you later undertake any investigation to**

25   **determine whether or not Brevon Developers was in the**

Page 22

1    **chain of title?**

2         A    I did.  I had a bring-down run and they were

3    not in the chain of title and it did not appear that it

4    affected their estate so we decided to move forward

5    with the foreclosure again.

6         **Q    So did you schedule yet another attempt to**

7    **foreclose on behalf of Access National Bank?**

8         A    Yes.

9         **Q    Would you look at Exhibit 14 for a moment,**

10   **please?**

11        A    Yes, sir.  That is the notice of foreclosure

12   sale for July 31st at 11 a.m.  You'll notice it's only

13   14 days after the previous one.

14        **Q    And were you able to effect and complete that**

15   **foreclosure sale?**

16        A    I was not.

17        **Q    Can you tell the Court why not?**

18        A    As I recall Roger Amendola then filed

19   bankruptcy.

20             MR. O'DONNELL:  Your Honor, move Exhibit 14.

21             THE COURT:  Fourteen is admitted.

22                              (The item referenced above,

23                               previously marked for

24                               identification as Movant's

25                               Exhibit No. 14, was received

Page 23

1                              into evidence.)

2           MR. O'DONNELL:  Your Honor, Exhibit 15 is the

3   bankruptcy docket sheet for the case of Roger Amendola,

4   case 09-16151 as printed from the docket of this Court.

5   Move admission by judicial notice.

6           THE COURT:  Any objection?

7           MR. FOREST:  No, Your Honor.

8           THE COURT:  Fifteen is received.

9                              (The item referenced above,

10                             previously marked for

11                             identification as Movant's

12                             Exhibit No. 15, was received

13                             into evidence.)

14          MR. O'DONNELL:  I would point out also that

15  the docket indicates that the case of Roger Amendola

16  was dismissed for failure to file schedules, Your

17  Honor.  That is at docket entry number 19.

18          BY MR. O'DONNELL:

19      **Q    Can you tell me please what happened after**

20  **that, Mr. Harvill?**

21      A    Again, the property came up for foreclosure.

22  I believe there was a motion from relief from stay, I

23  believe, and it came up for foreclosure again.

24      **Q    Can you tell me, please, would you look at**

25  **Exhibit 16 and describe that to the Court?**

Page 24

1      A     This is the notice of substitute Trustee sale

2   for a sale that was scheduled for October 5th, 2009 at

3   2:30 p.m.

4      **Q     Did that sale complete or commence?**

5      A     It did not.

6      **Q     And can you tell the Court why?**

7      A     As I understand it and as I know the borrowers

8   did another work-out with Access National Bank.  It

9   was, as I understand the terms of it, there was some

10  payment made and then there was also an agreement

11  between the parties as to the titling of the property.

12     **Q     And when you say an agreement with respect to**

13  **titling of the property, what did you understand that**

14  **agreement to be?**

15     A     The drafts of the agreements I saw re-titled

16  the property into the name of RMAA Real Estate

17  Holdings, LLC or as it was called in those documents,

18  Newco, the idea being they were going to put it into a

19  special purpose entity to hold title of the property.

20          Access National Bank was going to be a manager

21  of that entity and the unanimous consent of all

22  managers would be required to file any further

23  bankruptcy proceedings.

24     **Q     So based upon that this October 5th sale was**

25  **continued or called off?**

Page 25

1        A     I postponed the sale indefinitely based on

2   that work-out.

3              MR. O'DONNELL:  Your Honor, move admission of

4   Exhibit number 16.

5              THE COURT:  Sixteen is received.

6              MR. FOREST:  No objection.

7                              (The item referenced above,

8                               previously marked for

9                               identification as Movant's

10                              Exhibit No. 16, was received

11                              into evidence.)

12             BY MR. O'DONNELL:

13       **Q     Did that end your involvement, Mr. Harvill?**

14       A     For several months, yes.

15       **Q     What happened after those several months**

16   **expired?**

17       A     I received a call from Bob Shoemaker with

18   Access National Bank instructing me that the borrowers

19   had not abided by their agreements and that they wanted

20   to foreclose again, and we began foreclosure

21   proceedings again.

22       **Q     That was after the beginning of this year?**

23       A     It was.  It was in February or March of this

24   year.

25       **Q     Would you look at Exhibit number 20 in the**

Page 26

1   **book in front of you and describe that to the Court?**

2       A       This is a notice of substitute Trustee sale

3   for a sale to be conducted on May 24th, 2010 at two

4   p.m.

5       **Q       And can you tell me, please, did you complete**

6   **that foreclosure sale?**

7       A       We actually did manage to complete that

8   foreclosure sale.

9       **Q       And when you say "complete" it what do you**

10  **mean by complete it?**

11      A       I called the sale on the courthouse steps.  We

12  received bids.  We received a high bid.  We executed a

13  memorandum of sale and we set a settlement date of June

14  8th, 2010.

15      **Q       Tell me, please, what happened with respect to**

16  **that bid, who it was made by and what ultimately**

17  **occurred?**

18      A       The bid was made by 18688 Riverlook LLC who

19  was represented to be a limited liability company

20  information.  There were represented by an attorney by

21  the name of Tom Wiltshire who appeared at the sale with

22  a cashier's check from his law firm bank account

23  essentially, and he signed and executed the contract

24  related to that foreclosure sale.

25              Shortly after we executed the contract it was

Page 27

1   revealed to me that one of the principals of that was

2   Roger Amendola.

3        **Q      One of the?**

4        A     One of the principals of the 18688 Riverlook

5   entity information was going to be Roger Amendola.

6        **Q      What happened with respect to that foreclosure**

7   **sale?  Were you able to complete that and close on that**

8   **transaction?**

9        A     We were not.  They defaulted on the contract.

10  The memorandum of sale signed out.  The foreclosure

11  sale, they defaulted on it and were not able to close

12  by June 8th, 2010 so I declared the contract in default

13  and re-noticed it for another sale.

14       **Q      Would you look at Exhibit number 21, please,**

15  **and describe that briefly to the Court?**

16       A     That is the next foreclosure sale.  That was

17  the sale scheduled for June 23rd, 2010 at two p.m.

18       **Q      Were you able to complete that foreclosure**

19  **sale?**

20       A     I was not.

21       **Q      Can you tell the Court why not?**

22       A     There was an involuntary bankruptcy petition

23  filed against RMAA Real Estate Holdings, then current

24  title holding entity and I was notified of this by Mr.

25  Forest.

Page 28

1            MR. O'DONNELL:  Your Honor, move Exhibits 20

2     and 21.

3            THE COURT:  Twenty and 21 are received.

4                              (The items referenced above,

5                              previously marked for

6                              identification as Movant's

7                              Exhibit Nos. 20 and 21 were

8                              received into evidence.)

9            MR. O'DONNELL:  Your Honor, Exhibit number 22

10    is a copy of the Involuntary Petition filed in case

11    number 10-15244-SSM on behalf of RMAA Real Estate

12    Holdings, LLC.  This is not the incident case that's

13    before the Court.

14            This was an involuntary petition filed on June

15    22nd of this year by many of the same petitioners,

16    however in their capacity as members and identifying

17    the entity as a partnership rather than a corporation.

18            I would ask the Court to admit that by

19    judicial notice.

20            THE COURT:  Any objection?

21            MR. FOREST:  None, Your Honor.

22            THE COURT:  Twenty-two is received.

23                              (The items referenced above,

24                              previously marked for

25                              identification as Movant's

Page 29

1                           Exhibit No. 22 and 25, were

2                           received into evidence.)

3          MR. O'DONNELL:  Thank you, Your Honor.  Your

4   Honor, I would also move the admission of Exhibit

5   number 25 which is Judge Mitchell's order dismissing

6   case number 10-15244 and holding that there was no

7   authority by the members to effect the filing of an

8   involuntary petition on behalf of an LLC.

9          MR. FOREST:  No objection as to the order,

10  Your Honor.

11         MR. O'DONNELL:  Thank you.

12         THE COURT:  Twenty-five will be received.

13         BY MR. O'DONNELL:

14     Q    **Mr. Harvill, you're aware that that case was**

15  **subsequently dismissed by this Court; is that correct?**

16     A    I am.  I saw the order myself on Pacer.

17     Q    **And after that did you then recommence**

18  **foreclosure proceedings again?**

19     A    I did.

20     Q    **And would you look at Exhibit number 23?**

21     A    That is a notice of substitute Trustee sale.

22  The sale date for that was August 3rd, 2010 at two p.m.

23     Q    **Can you tell the Court what happened with**

24  **respect to that particular foreclosure sale?**

25     A    Once again it did not go through because of

Page 30

1    the filing of the involuntary petition in the incident

2    case that we're here for today.

3            MR. O'DONNELL:  Move Exhibit number 23, Your

4    Honor.

5            THE COURT:  Any objection?

6            MR. FOREST:  None, Your Honor.

7            THE COURT:  Twenty-three is received.

8                             (The item referenced above,

9                              previously marked for

10                             identification as Movant's

11                             Exhibit No. 23, was received

12                             into evidence.)

13           MR. O'DONNELL:  Thank you, and I would move 24

14   which is a copy of the involuntary petition filed at

15   1:07 p.m. on the date of August 3rd.

16           MR. FOREST:  No objection.

17           THE COURT:  I'll receive 24.

18                             (The item referenced above,

19                              previously marked for

20                             identification as Movant's

21                             Exhibit No. 24, was received

22                             into evidence.)

23           MR. O'DONNELL:  Thank you, Your Honor.

24           BY MR. O'DONNELL:

25       **Q    Mr. Harvill, are you familiar with the status**

1    **of the record of title on this property?**

2         A     I am.

3         **Q     Would you describe your professional**

4    **experience in the area of conducting title**

5    **examinations --**

6              MR. FOREST:  Your Honor, I don't know that the

7    witness' testimony is, with regard to an expert makes

8    him entitled to be pertinent to the issue.

9              MR. O'DONNELL:  I'm going to move him as an

10   expert, Your Honor.

11             THE COURT:  What are you trying to show?

12             MR. O'DONNELL:  I'm going to have him testify

13   as to documents of record, Your Honor, and the Loudoun

14   County land records specifically memoranda of

15   mechanic's liens and judgment liens and the deeds of

16   trust and their effect on the state of title with

17   respect to this property.

18             THE COURT:  What exhibits are those?

19             MR. O'DONNELL:  We will begin, Your Honor,

20   with Exhibit number two which is the deed of trust for

21   Access National Bank.  I would think that Mr. Forest

22   would simply stipulate to that.

23             That is the deed of trust of record that

24   evidences the lien in favor of Access.  Exhibit number

25   four, which is the deed of trust in favor of the second

Page 32

1   trust holder again with the face amount of that

2   instrument being $1,000,000.

3           Exhibit number six, which is the abstract of

4   the title report during the first six pages and then

5   after that, copies of all of the recorded instruments

6   to which that abstract refers and that is memorandums

7   of liens of mechanic's liens, judgment liens, and other

8   matters of record that affect title to the property.

9           Specifically, Your Honor, I expect to qualify

10  Mr. Harvill as an expert in the area of title

11  examination and the ability to provide opinion

12  testimony as to the effect on documents of record upon

13  title to this property, and I'm going to have him

14  identify those documents and advise the Court with

15  respect to his personal review of these matters of

16  record as late as August 3rd as of the current status

17  of title.

18          THE COURT:  Do you object to the Exhibits two,

19  four, or six?

20          MR. FOREST:  Your Honor, I don't object to

21  two.  I don't object to four.  I'm looking at six now.

22          MR. O'DONNELL:  The only thing that's not a

23  matter of record out of Loudoun County, Your Honor, are

24  the first six pages which are just the abstract report

25  that was delivered to Mr. Harvill.

Page 33

1          THE COURT:  Mr. Harvill did not do the

2    abstract himself?

3          MR. O'DONNELL:  He did not do it.  He would

4    testify, Your Honor, that he has had bring-downs, he

5    had personally conducted bring-downs.

6          THE COURT:  We are just looking at the

7    evidentiary basis for that.  Six, is there?

8          MR. FOREST:  Your Honor, I don't object to the

9    matters that on their face show that they're recorded

10   in the land records but subject of course to Mr.

11   Amendola's ability to testify that perhaps some of

12   these have been satisfied or some of the claims may be

13   time barred.

14          But in terms of their introduction I don't

15   object to that.  I do have concerns about the title

16   report because the title report sets forth, presumably

17   if it's correct it would set forth conclusions that are

18   based upon the documents --

19          THE COURT:  You are agreeable to all the pages

20   except the first six?

21          MR. FOREST:  Yes.

22          THE COURT:  All right, I'll admit Exhibit six,

23   everything except the first six pages, and go ahead

24   with your examination.

25   //

Page 34

1                              (The document referenced

2                              above, previously marked as

3                              Movant's Exhibit No. 6, was

4                              received into evidence.)

5          MR. O'DONNELL:  Thank you, Your Honor.

6          BY MR. O'DONNELL:

7     **Q    Would you describe, please, your professional**

8     **expertise in the area of conducting title examinations?**

9     A    I've been doing real estate law since I was

10    admitted to the bar.  It was actually before I was

11    admitted to the bar, I was a Real Estate Title Agent

12    for a title company in Vienna and I reviewed titles as

13    a Title Agent and had to give opinions of title in that

14    capacity.

15          Once I was admitted to the bar I continued to

16    do title work as a Real Estate Settlement Attorney and

17    I would have to review title searches before each

18    closing, residential and commercial refinance and

19    purchase closings that I would handle.

20          For each one of those I would have to review

21    title just before they were done, do a final review.  I

22    would have to review title abstracts.  I would often do

23    bring-downs.  I was the person in my law firm primarily

24    responsible for doing post-closing bring-downs to make

25    sure that certain things had been cleared off record of

1    title.

2           I would say that I've handled over 3,000

3    residential and commercial refinance and purchase

4    transactions if I had to estimate.  I have handled

5    literally thousands of bring-down title searches.

6           I have handled probably hundreds of full title

7    searches and I do routine title searches as part of

8    both my real estate litigation practice as well as my

9    real estate transaction practice.

10   **Q    And in the context of all of that do you**

11   **routinely offer opinions as to the effect on title of**

12   **documents of record?**

13   A    Every closing that I've handled, every

14   settlement I have to have an opinion of title before I

15   walk into the settlement as to whether it's clear and

16   whether the bank or whether the deeds can be recorded

17   without clouds on title, whether the liens can be

18   recorded without clouds on title.

19          So that's for every settlement I've handled I

20   am required to have an opinion of title.

21   **Q    With respect to the foreclosure in this**

22   **particular case have you also undertaken a review of**

23   **title and a review of the instruments of record that**

24   **affect title?**

25   A    I have.  I usually, for my first title search

1   when I do a foreclosure, I get it done by a title

2   abstractor as a baseline.  I double check their work.

3          I then also, before any, if a sale is

4   postponed for any reason I go and do bring-downs to

5   update myself as to what the status of title is, see if

6   anything recent has been filed and that is routine

7   practice.

8          MR. O'DONNELL:  Your Honor, I move Mr. Harvill

9   as an expert in the area of title examinations and the

10  effect of documents of record upon title.

11         I think a lot of his testimony will be factual

12  in nature but I will ask him to opine about the effect

13  of record instrument upon the title of this property

14  and so for that reason I would move his admission as an

15  expert or qualification of an expert.

16         MR. FOREST:  Your Honor, the only objection I

17  have is that this witness is not going to -- I doubt

18  that this witness is going to be testifying as to

19  matters the Court is not capable of understanding

20  independently of his testimony.

21         THE COURT:  I'm going to allow him as an

22  expert.  I'm not quite sure what he's going to opine on

23  but he's certainly an expert within the fields that Mr.

24  O'Donnell has suggested here.

25         MR. O'DONNELL:  Thank you, Your Honor.

Page 37

1          BY MR. O'DONNELL:

2     **Q     Mr. Harvill, in the book in front of you would**

3  **you look at Exhibit number two briefly?**

4     A     Okay.

5     **Q     Would you describe that to the Court?**

6     A     This is the deed of trust securing Access

7  National Bank with a construction loan rider and it is

8  the document that we're, it's the lien that we were

9  attempting to enforce by the foreclosure sale.

10          It also has a fixed adjustable rate rider

11  attached to the deed of trust.  This is a copy of the

12  recorded document.

13     **Q     And this is a lien on title to the property?**

14     A     It is.

15     **Q     And the face amount of the note secured**

16  **according to this instrument?**

17     A     It is $2,250,000.

18     **Q     In the context of preparing for foreclosure**

19  **did you obtain payoff information with respect to that**

20  **property?**

21     A     I did.

22     **Q     With respect to that loan.  Would you look at**

23  **Exhibit three for a moment and describe that to the**

24  **Court if you can?**

25     A     This looks like the form, payoff statement

1    that Access National Bank uses.  This one is dated

2    August 4th with a total due of $2,236,728.25 and it

3    gives a per diem which is what, when I do a foreclosure

4    what I need is the per diem so I can calculate the

5    daily on the loan.

6               MR. O'DONNELL:  Move Exhibit three, Your

7    Honor.

8               MR. FOREST:  No objection, Your Honor.

9                              (The document referenced

10                             above, previously marked as

11                             Movant's Exhibit No. 3, was

12                             received into evidence.)

13              THE COURT:  Three is admitted.

14              MR. O'DONNELL:  Thank you.

15              BY MR. O'DONNELL:

16        Q    **Would you look at Exhibit four and identify**

17   **that document?**

18        A    This is the second deed of trust with the

19   beneficiary being Todd Tarring who, as I understand it

20   is the second lien holder.  It's got a face amount of

21   $1,000,000.

22        Q    **And that also constitutes a lien on the**

23   **property; is that correct?**

24        A    It does.

25        Q    **And did you obtain any payoff information with**

Page 39

1   **respect to this property in preparation of the**

2   **foreclosure?**

3          A    I did.

4          **Q    Would you look at Exhibit number five and tell**

5   **the Court what that is?**

6          A    This is a copy of the payoff statement I

7   received from Warren R. Stein who is the attorney

8   representing Mr. Tarring and it sets forth the amounts

9   that is owed on that debt as well as the interest rate

10  which was five percent per month.

11              MR. O'DONNELL:  Move Exhibit five, Your Honor.

12              MR. FOREST:  Your Honor, we would object on

13  grounds of hearsay and authentication.

14              THE COURT:  Let me ask you about the hearsay

15  on number five.

16              MR. O'DONNELL:  I'm sorry?

17              THE COURT:  The hearsay objection on number

18  five.

19              MR. O'DONNELL:  If I can, Your Honor, let me

20  see if I can address is through opinion testimony of

21  the witness for a moment if I may.  If I can have a

22  moment to make some additional inquiry before --

23              THE COURT:  That will be fine.  Go ahead.

24              MR. O'DONNELL:  Thank you.

25              BY MR. O'DONNELL:

Page 40

1    Q    Mr. Harvill, in the context of examining title

2  in connection with this transaction is it your

3  responsibility to determine not just the nature of

4  liens but the extent of those liens?

5    A    It is.  Particularly in a foreclosure

6  situation what you hope happens is that the sale goes

7  for more than the lien that you're foreclosing and then

8  you have to, by Virginia law you have to pay money down

9  the line, as they say, to the junior lien holders.

10       Todd Tarring was the first lien holder after

11  Access National Bank.  I had indications that the sale

12  price of the property would exceed the lien of Access

13  National Bank so I had to know how much money I needed

14  to pay and to whom I needed to pay it.

15       And that is what this document -- in my

16  practice this is the type of document I receive to

17  inform me of that information.

18    Q    And have you, based upon the documents of

19  record and communication with note holders or lien

20  holders been able to reach an opinion as to the amount

21  of liability evidenced by or secured by Exhibit number

22  four?

23       MR. FOREST:  Your Honor, I'm going to object

24  because first of all, if this Trustee, the substitute

25  Trustee is in fact foreclosing on the first he does not

Page 41

1   need to reach an opinion as a part of that particular

2   activity as to what comes afterward.

3          In the event the sale were consummated then

4   the substitute Trustee would have some obligation to

5   try and determine what happens with any proceeds that

6   were left over.

7          The other objection I have, Your Honor, is

8   that he cannot by virtue of the attempted opinion

9   effort, testify as to facts which would not be

10  admissible directly.

11         In other words, he can't say --

12         THE COURT:  I understand.  What was your

13  question?

14         MR. O'DONNELL:  Your Honor, the impact and

15  import of my query is to solicit or elicit from Mr.

16  Harvill his opinion as to the extent and amount of the

17  lien that is of record based upon his examination.

18         He is permitted as an expert, as he testifies

19  about the effect of record documents upon the title of

20  the property, to rely upon hearsay and to base his

21  opinion that he is enunciating to the Court upon those

22  hearsay statements.

23         And so, although I would acknowledge that from

24  a factual standpoint the letter at Exhibit number five

25  constitutes hearsay.  To the extent that Mr. Harvill

Page 42

1    has relied upon it in determining an opinion as to the

2    extent of liens that would be required to be paid from

3    Exhibit number four, I believe it's admissible before

4    the Court.

5            THE COURT:  I'm going to sustain the

6    objection.  It is hearsay.  It is not technical or

7    require any expertise.  What it requires is a

8    foundation of the payoff and the knowledge of that

9    deriving from the books and records of the one to whom

10   is owed the money or from other sources as may be

11   appropriate.

12           What you're doing is trying to get in hearsay

13   in the guise of expert testimony but this testimony is

14   not expert testimony so I am going to sustain the

15   objection.

16           MR. O'DONNELL:  I understand, Your Honor.

17   Thank you.

18           BY MR. O'DONNELL:

19       **Q     Mr. Harvill, let me ask you to turn to Exhibit**

20   **number six for a moment.  Would you describe that**

21   **document to the Court briefly?**

22       A     The first six pages which have been at issue,

23   that's the title abstract that I receive routinely when

24   I do a first search on a property when I receive a

25   foreclosure inquiry from Access.

Page 43

1          I always order a title search and the

2    remaining documents in this exhibit are copies of liens

3    that appeared on title as of February of this year

4         **Q    Have you reviewed all of those documents?**

5         A    I have.

6         **Q    Do you have an opinion as to the impact or**

7    **import as to title with respect to each of these**

8    **documents?**

9         A    My opinion is that most of them except for

10   perhaps the mechanic's liens do attach.   There are some

11   issues with the mechanic's liens in this particular

12   case relating to whether they were ever enforced or

13   not.

14          There are several judgment liens on the

15   property.   There's, just going through there's a

16   memorandum --

17        **Q    Take a moment to look at them one at a time.**

18        A    Sure.

19        **Q    Let me ask you first, in the context of your**

20   **examination of title did you undertake to examine**

21   **whether or not real estate taxes were current on this**

22   **property?**

23        A    I did.

24        **Q    Could you tell the Court, please, what you**

25   **determined?**

Page 44

1      A    I determined as of June of this year --

2           MR. FOREST:  Your Honor, it's not a matter of

3      opinion whether an obligation is owed.

4           THE COURT:  Sustained.

5           MR. O'DONNELL:  Your Honor, he's conducted the

6      examination.

7           THE COURT:  I know there are real estate

8      taxes.  I don't know the amount and that's what you're

9      getting at and I'm not going to allow his opinion on a

10     matter of fact of that nature.

11          MR. O'DONNELL:  All right.

12          THE COURT:  Real estate taxes or the first

13     lien to the extent that they are unpaid.  That's by

14     statute.

15          BY MR. O'DONNELL:

16     **Q    Mr. Harvill, let me have you turn past the**

17     **first six pages of Exhibit number six and begin with**

18     **the memorandum of lien for association assessment?**

19     A    Correct.

20     **Q    Are you familiar with that document?**

21     A    I am.

22     **Q    Could you tell the Court what your opinion is**

23     **with respect to the impact of that document on title to**

24     **the property?**

25     A    I believe that's a valid lien on the property.

Page 45

1    From the land records it appears that it's a valid lien

2    on the property and they have been on my notice list

3    for this particular property.

4         As required by Virginia law the homeowners'

5    associations have to be informed of foreclosure sales.

6    **Q    Would you look at the next page which is a**

7    **memorandum of mechanic's lien claimed by Walls by**

8    **McKinley, Incorporated and answer the same question,**

9    **that is, the effect of that document in your opinion on**

10   **title to the property?**

11   A    Walls by McKinley, this was, I believe a valid

12   mechanic's lien at the time it was filed.  It may or

13   may not still be a valid lien.  What we did in this

14   particular foreclosure sale is we made the sale subject

15   to mechanic's liens because of issues with pulling,

16   with the repeated bankruptcies.

17        We did not want to -- I did not want to have

18   to render any kind of guarantee or warranty of title

19   and the deed to a subsequent purchaser over these

20   mechanic's liens.

21        So we did the sale subject to the mechanic's

22   liens because they appear to me valid on title for when

23   they were filed.  The issue was which ones had been

24   enforced in a timely fashion.

25   **Q    Would that be true for all of the mechanic's**

1    **liens or do you have particular knowledge as to any of**

2    **the others?**

3        A    I do have particular knowledge to the

4    mechanic's liens that were signed off by Robert

5    Richardson.  That would be the mechanic's lien.

6        **Q    The next one, the claimant Fence Solutions?**

7        A    Fence Solutions, LLC.  My understanding, and I

8    have received notice of a filing of a petition to

9    enforce that lien.

10       **Q    All right.**

11       A    And then going to the next one which is Lewis

12   Aquatech Pool Supply, Inc. is the claimant.  That one

13   also was done by Robert Richardson.  As I understand it

14   that has -- I have also received notice of a filing of

15   a petition to enforce that lien which I believe is

16   pending currently.

17            There's another mechanic's lien with a

18   different instrument number, though.  It seems to cover

19   the same debt filed by Robert Richardson.  I believe

20   that is also a valid mechanic's lien although it may be

21   duplicative and as I understand it that has been filed

22   to -- a petition to enforce that has been filed.

23       **Q    Okay.**

24       A    The next one is Perfect Landscapes, LLC.  As

25   far as I know I have never received notice that a

Page 47

1   petition to enforce this has been filed but it

2   certainly was a valid lien at the time it was filed.

3           Whether the timing of it for filing a petition

4   has expired, we basically decided to, in order making

5   warranty in the deed related to that we did the sale

6   subject to the mechanic's lien.

7       Q    **All right.**

8       A    The next one is Perfect Landscapes, LLC.  Same

9   opinion.  The next one is the memorandum of lien for

10  association assessments for Lansdowne on the Potomac.

11  Once again, that's the homeowners' association.

12          We've certainly made sure they've received

13  their notices as required by Virginia Code 55-59.1 and

14  that appeared to be a valid lien as of the time it was

15  filed, and I have further information on that which we

16  can talk about, I guess in a moment.

17          I'll go through each one of these.  There's a

18  memorandum of lis pendens from Michael Burgess, Diane

19  Burgess of Burgess Custom builders against Brett

20  Amendola.

21          There was a lawsuit pending against Mr.

22  Amendola by the Burgesses.  This one as I understand it

23  was against Brett Amendola and Janet Amendola I

24  believe, this particular one.

25          Strike that.  This one is dated 12/11/2009.  I

Page 48

1   believe this is a newer lawsuit.  There was a lawsuit

2   pending in Fairfax that was filed against the Amendolas

3   by the Burgesses.

4          That one was reduced to judgment against Brett

5   Amendola for I believe $700,000.  This is a memorandum

6   of a lis pedens of a new action that's been filed by

7   the Burgesses against the Amendolas.

8      **Q     To which the claim of the subject property is**

9   **in dispute?**

10     A     Yeah, they claim the subject property is in

11  dispute and I have discussed that with the attorney for

12  the Burgesses and essentially this appears to be a

13  valid lis pendens to me since the case, as I understand

14  it the last time I checked was still pending.

15     **Q     You then have a judgment order?**

16     A     We do have a judgment.  This judgment appears

17  to be attached to the property.  It's in favor of Eagle

18  Bank for $124,599.17 plus interest and attorney's fees.

19         It is against Brett and Janet Amendola.  It

20  appears to attach against their interest in the

21  property, that is, their 50 percent share.

22         The next is an abstract of judgment from the

23  Fairfax County Circuit Court from the Burgesses versus

24  Brett Amendola.  The Burgesses obtained, as I

25  understand a $700,000 judgment against Brett Amendola

Page 49

1   with interest and fees.

2          I actually watched part of that proceeding

3   when it was going on and the judgment was only rendered

4   against Brett Amendola because Janet Amendola had

5   declared bankruptcy a day or two before this trial.

6          The same bankruptcy that stopped our May 2009

7   foreclosure sale also stopped them from getting a

8   judgment against Janet Amendola.

9          As I understand it because Brett and Janet

10  are, as far as I know are still married.  This judgment

11  may not attach to the property because of the fact that

12  Brett and Janet own their share of the properties

13  tenants by the entirety.

14     **Q    Very well.**

15     A    So but I don't have current knowledge as to

16  whether they have or have not gotten divorced or

17  anything of that nature which would change that

18  opinion.

19          The next one, the next page looks like it's

20  simply a reflection of that same judgment.

21     **Q    And then the last is just a homestead deed,**

22  **correct?**

23     A    Order of non-suit against the Defendant

24  Wachovia; these were things that popped up on title

25  that didn't really give me too much concern.  There's a

Page 50

1   homestead deed from Janet Amendola which indicates that

2   she filed bankruptcy previously.

3       **Q    Very good.  Let me ask you finally just to**

4   **look at Exhibit number 19 and identify that document,**

5   **please?**

6       A    This document is a deed between Roger and

7   Maureen, Brett and Janet to RMAA Real Estate Holdings,

8   LLC which was the single purpose entity that was formed

9   for purposes of holding title to this property to

10  prevent future sequential bankruptcy filings by the

11  Amendola family.

12          MR. O'DONNELL:  Very good.  Move Exhibit 19,

13  Your Honor.

14          THE COURT:  Nineteen is received.

15                          (The item referenced above,

16                           previously marked as

17                           Movant's Exhibit No. 19, was

18                           received into evidence.)

19          MR. O'DONNELL:  That's all I have for Mr.

20  Harvill, Your Honor.

21          THE COURT:  Thank you.

22              CROSS EXAMINATION

23          BY MR. FOREST:

24      **Q    Mr. Harvill, there was also one more attempt**

25  **to foreclose that you didn't discuss, wasn't there?**

Page 51

1      A    If you have a date it may ring a bell.

2      **Q    March of 2010?**

3      A    Yes, there was a foreclosure date scheduled

4    for the end of March 2010.

5      **Q    Why did that not go forward?**

6      A    As I understand it there was a work-out

7    arranged between the bank and the borrowers.

8      **Q    Did you have the opportunity to -- do you know**

9    **now who Tom Wiltshire is?**

10     A    I do.

11     **Q    Did you have the opportunity at the time he**

12   **was bidding to ask him if the Amendolas had any**

13   **interest in the company that was bidding?**

14     A    At the time he was bidding he approached

15   the -- I did not have an opportunity during the

16   bidding.  It was actually a pretty good bidding

17   session.  It was hot and heavy.

18          There were several interested parties there.

19   I learned of the -- he said that a person named

20   Amendola might be involved right as we were signing the

21   memorandum, that is, right when he signed the

22   memorandum.

23          I said, "this is an LLC in formation?"  He

24   said yes.  I said, "are any of the principals named

25   Amendola?" and he said, "one of them might be."

Page 52

1       **Q       But you had an opportunity to ask that**

2  **question before the bidding began?**

3       A    I did not.  He approached the bidding after,

4  just as I was beginning to start the bidding.  He

5  approached the bid.

6            He had called me earlier the day before and I

7  believe I had spoken to him that morning and he said he

8  was Tom Wiltshire and he was coming to bid and he

9  wanted to know the deposit amount.

10            The check he presented only had his name on it

11  and it said Tom Wiltshire on it and so --

12       **Q    Did he prevent you from inquiring of Mr.**

13  **Wiltshire as to whether any of the Amendolas had any**

14  **interest in this company?**

15       A    It's not really -- see, here's the thing.

16  It's not really important whether or not the Amendolas

17  did.  If someone shows up with a check and can bid at a

18  sale there's not much I can do.

19            I have to let them bid.  If Brett Amendola

20  showed up with a check I would have to let him bid if

21  he had the required deposit amount.

22            They have a right to buy the sale even at

23  their own foreclosure so there wasn't really any point

24  necessarily in making an inquiry.

25            The way you stop people from doing that,

1  facetiously, is have larger deposits.

2          THE COURT:  What was the deposit?

3          THE WITNESS:  It was $25,000 on the first

4  sale.  We were trying to encourage action on the

5  property.

6          BY MR. FOREST:

7      **Q    Do you know whether there was a mechanic's**

8  **lien agent nominated for this property?**

9      A    I believe when we first discovered the

10  mechanic's liens we had some discussions on that.  I do

11  recall seeing some documents relating to mechanic's

12  liens agents but what -- we made the decision fairly

13  early on to pursue the sale subject to mechanic's liens

14  and leave it up to the buyer to sort through that.

15          Because of the issues with the bankruptcies,

16  the delays caused by the bankruptcies and things of

17  that nature we just decided that it was best to allow

18  the buyer to sort through the mechanic's liens since

19  the sale it subject to.

20      **Q    So if a mechanic's lien agent was appointed**

21  **that would have an impact upon whether or not these**

22  **liens could possibly attach?**

23      A    It could.

24          MR. FOREST:  No further questions, Your Honor.

25  //

1                         REDIRECT EXAMINATION

2            BY MR. O'DONNELL:

3       **Q    In the March 2010 foreclosure that was**

4  **stopped, are you aware that was the result of an**

5  **alleged contract that was produced by the Amendolas?**

6       A    My understanding is that there was a buyer

7  interested in the property, there was a contract, and

8  there was some money that changed hands so there was a

9  payment to the bank as far as, and that they were going

10 to give -- the bank was going to give the Amendolas the

11 opportunity to have the property sold.

12      **Q    And you're aware that the contract never**

13 **closed?**

14      A    I am.

15           MR. O'DONNELL:  Thank you.  That's all I have,

16 Your Honor.

17           THE COURT:  All right, thank you.  Can the

18 witness be excused?

19           MR. O'DONNELL:  Yes, Your Honor.

20           MR. FOREST:  Yes, Your Honor.

21           THE COURT:  Thank you for coming.  You're free

22 to leave.

23           THE WITNESS:  Thank you, Your Honor.

24           MR. O'DONNELL:  Thank you for accommodating

25 us, Your Honor.

Page 55

1         THE COURT:  So what do you have left?

2         MR. O'DONNELL:  I have Mr. Shoemaker, Your

3   Honor, and I would expect him to be 20 to 30 minutes.

4   I have an estate residential appraisal report of the

5   property and the Appraiser is also present.

6         THE COURT:  And what do you have?

7         MR. FOREST:  I have Mr. Amendola and not to be

8   lighthearted about it, Your Honor, but a bunch of

9   hearsay documents.  I say that because I have no

10  witnesses.  We weren't able to get witnesses here to

11  authenticate them.

12        Since you're asking about my time estimate,

13  maybe 20, 30 minutes for Mr. Amendola.

14        THE COURT:  We'll have to adjourn -- cross

15  that bridge when we come to it.  All right, we'll go

16  ahead and recess for lunch.  You can contact your other

17  clients, can't you, as far as the time to return?

18        MR. MARTIN:  I will.  My client won't be

19  present at the hearing but I'll contact opposing

20  Counsel and inform them of the delay so that their

21  clients don't.  My main witness will be his client.

22  I'll inform them of the delay.

23        THE COURT:  All right, well, let's see what

24  we're going to do.

25        MR. MARTIN:  Can I tell them around 3:00?

Page 56

1           THE COURT:  I think 3:00.  Why don't we

2    reconvene at 3:00?  Now the question is which case.  We

3    either finish this or interrupt it.  I'm inclined to go

4    ahead and finish this case.

5           MR. MARTIN:  As Mr. O'Donnell said he has

6    seniority over me.  I have no problem continuing or

7    extending mine, subordinating my hearing to his.

8           THE COURT:  Subordination, all right.  Why

9    don't you tell them -- do you think your case will take

10   an hour or less?

11          MR. MARTIN:  I think it will take an hour to

12   an hour and a half.  I'll have two witnesses.  They'll

13   have one or two witnesses.  The argument is relatively

14   short.  I'm hoping that we can do it within an hour.

15          THE COURT:  Why don't you tell them 4:00 and

16   we'll return here at 3:00?  That will give you all an

17   hour to put your evidence in and make your arguments

18   that you need to make.

19          All right, thank you.

20          MR. FOREST:  Thank you, Your Honor.

21          (Off the record at 1:23 p.m.)

22          (On the record at 3:02 p.m.)

23          THE COURT:  Go ahead, Mr. O'Donnell.

24          MR. O'DONNELL:  Thank you, Your Honor.  I call

25   Robert Shoemaker to the stand.

Page 57

1          THE COURT:  Mr. Shoemaker, would you come up

2    to the Clerk's desk to be sworn, please?

3          MR. FOREST:  Your Honor, I realize I didn't

4    ask for this before when Mr. Harvill was testifying but

5    can I now have a rule on witnesses?

6          THE COURT:  Who are they?

7          MR. O'DONNELL:  The only other witness I have

8    now, Your Honor, would be the expert.  He's permitted

9    to sit in.

10         THE COURT:  Only if the testimony is necessary

11   for formulating his opinion.

12         MR. O'DONNELL:  He's not a fact witness, Your

13   Honor.  He's going to introduce the appraisal.

14         THE COURT:  What's his name?

15         MR. O'DONNELL:  Gilbert Rogers, Your Honor.

16         THE COURT:  There's been a request for a rule

17   on witnesses.  I'm going to ask if you would sit in the

18   witness room.  We'll come get you at the appropriate

19   time.

20         All right, come on up and be sworn, please.

21         MR. O'DONNELL:  Your Honor, before I start, in

22   an abundance of caution I just don't recall.  Exhibit

23   number 13 was identified by Mr. Harvill.  It was the

24   fax by attorney Azarcon on the Brevon Developers case.

25         I thought I moved it in.  I'm not sure that I

Page 58

1    did.

2            THE COURT:  That was admitted.  Thirteen was

3    admitted.  Did you have objection to it?

4            MR. FOREST:  No objection.

5            THE COURT:  If you do I'll reopen it and let

6    you state it.

7            MR. FOREST:  No, no objection, Your Honor.

8            THE COURT:  All right, 13 is in.

9            MR. O'DONNELL:  Thank you, Your Honor.

10           Whereupon,

11                      ROBERT SHOEMAKER

12           was called as a witness on behalf of the

13   Creditor and, having been first duly sworn, was

14   examined and testified as follows:

15                    DIRECT EXAMINATION

16           BY MR. O'DONNELL:

17      **Q    Would you state your name and business address**

18   **please?**

19      A    It's Robert Shoemaker.  My business address is

20   1800 Robert Fulton Drive in Reston, Virginia 20191.

21      **Q    Mr. Shoemaker, would you describe to the Court**

22   **your occupation and employment?**

23      A    I am the Chief Credit Officer at Access

24   National Bank.

25      **Q    With respect to the transaction that we have**

Page 59

1   **been talking about here in connection with this**

2   **proceeding, can you tell me, please, what**

3   **responsibility or involvement you have had with respect**

4   **to the loan involving 18688 Overlook Court, Leesburg,**

5   **Virginia?**

6       A    I was originally responsible for taking the

7   application, getting it approved.  Managed the credit

8   on and off in the beginning but since it became kind of

9   a workout I took it back over and I've been primarily

10  responsible for all aspects of it.

11      **Q    When did it become, in the bank's estimation a**

12  **workout, if you will?**

13      A    Really just about the time of the first

14  maturity.  I believe that was probably in '07.  It was

15  a 12 month construction loan and we were supposed to be

16  in and out in 12 months and we're still not out.  The

17  house isn't completed.

18      **Q    I'm going to walk you through some documents**

19  **and I want you to take a look at them, identify them**

20  **for me and then I'll have a few questions.  If I could**

21  **begin first with the exhibit book that's in front of**

22  **you, if you would turn to Exhibit number one?**

23      A    Okay.

24      **Q    Would you describe that document to the Court,**

25  **please?**

Page 60

1      A    That's the promissory note that the borrowers

2  executed in connection with the loan.

3           MR. O'DONNELL:  Move Exhibit number one, Your

4  Honor.

5           THE COURT:  Any objection?

6           MR. FOREST:  None, Your Honor.

7           THE COURT:  Exhibit number one is admitted.

8                           (The item referenced above,

9                            previously marked as

10                           Movant's Exhibit No. 1, was

11                           received into evidence.)

12           MR. O'DONNELL:  Thank you, sir.

13           BY MR. O'DONNELL:

14      **Q    Number two is the deed of trust, correct?**

15      A    Yes, it is.

16           MR. O'DONNELL:  That document has already been

17  admitted, Your Honor.

18           BY MR. O'DONNELL:

19      **Q    Look at Exhibit number three for a moment and**

20  **tell me what that is?**

21      A    It's our payoff letter.

22      **Q    Can you tell the Court, please, does that**

23  **payoff represent the full amount owed to Access**

24  **National Bank as of today's date with respect to the**

25  **property?**

Page 61

1    A    With respect to the additional interest from

2  August 3rd through today.

3    **Q    Are there any other costs that would be**

4  **incremental from August 3rd to today?**

5    A    Additional legal fees and an appraisal fee.

6    **Q    Guys like me?**

7    A    Yes, sir.

8    **Q    Do you have any idea what the total of those**

9  **additional costs would be?**

10   A    Probably talking at least another $15,000.

11   **Q    Did you listen to Mr. Harvill's testimony here**

12 **this morning or early this afternoon?**

13   A    Yes.

14   **Q    And did you agree with his testimony or**

15 **description of events respecting the prior foreclosure**

16 **attempts with respect to this property?**

17   A    Yes.

18   **Q    Is there anything in his testimony that you**

19 **feel is important to correct or draw to the Court's**

20 **attention?**

21   A    No.

22   **Q    Mr. Shoemaker, through all of the prior**

23 **bankruptcies that have affected this particular**

24 **property has there been any proposed or attempted**

25 **reorganization by any of the putative debtors?**

Page 62

1           MR. FOREST:  Your Honor, I'm going to object

2    to that question because the bankruptcies on their face

3    state that they're Chapter 7s.

4           MR. O'DONNELL:  It's a question, Your Honor.

5           THE COURT:  I'll allow the answer to it.

6           THE WITNESS:  No.

7           BY MR. O'DONNELL:

8      **Q     Has there been any attempt during any of those**

9    **to effect any payment or treatment of the claim of**

10   **Access National Bank?**

11     A    No.

12     **Q     Are you receiving -- and when I say "you," is**

13   **Access National Bank receiving current payments under**

14   **the loan?**

15     A    No, no we're not.  I believe the last payment

16   we received was in March of this year.

17     **Q     I want to take a few minutes and discuss the**

18   **decision to forbear from the October 2009 foreclosure.**

19   **Are you familiar with that notice of foreclosure?**

20     A    Yes.

21     **Q     And Mr. Harvill testified earlier today that**

22   **that foreclosure was ultimately stayed because the bank**

23   **entered into an agreement of forbearance with the**

24   **borrowers at that time; is that correct?**

25     A    Yes.

Page 63

1    **Q      Can you tell me, please, how you were involved**

2    **in the negotiation and ultimate decision?**

3    A    I negotiated the forbearance with the

4    borrowers, primarily with Brett Amendola and Roger

5    Amendola.  There was some reluctance among some of the

6    other people at the bank to enter into a forbearance

7    just because of what we'd already been through with the

8    thwarted foreclosure attempts.

9    **Q      So what lead the bank then to decide to**

10   **foreclose?  What motivated you to decide to effect that**

11   **forbearance?**

12   A    The borrowers indicated that they had a cash

13   flow stream that would be sufficient to make payments

14   of $50,000 per month plus inject $50,000 per month into

15   completing the construction which was of primary

16   importance to us.

17         Getting the house built made it significantly

18   more marketable.  One of the things that we were not

19   going to do was continue to let the property stay

20   titled as it was.

21         We felt it significantly important to transfer

22   title into RMAA, the new LLC that was formed and in

23   that negotiation the bank was going to be a managing

24   member along with Roger Amendola.

25         Because we've been through these serial

Page 64

1    bankruptcies and nothing was getting accomplished it

2    was really no other way to proceed, was to have that

3    done and have the terms in there that we negotiated.

4        **Q    With respect to those terms let me draw your**

5    **attention in the book in front of me to Exhibit number**

6    **17, if you could turn to that for a moment, please?**

7        A    Okay.

8        **Q    Can you tell the Court what Exhibit 17 is?**

9        A    This is the forbearance agreement that we

10   negotiated.

11          MR. O'DONNELL:  Your Honor, move Exhibit

12   number 17.

13          MR. FOREST:  No objection, Your Honor.

14          THE COURT:  Seventeen is admitted.

15                         (The item referenced above,

16                         previously marked as

17                         Movant's Exhibit No. 17, was

18                         received into evidence.)

19          MR. O'DONNELL:  Thank you.

20          BY MR. O'DONNELL:

21       **Q    And this was signed by you on page nine of the**

22   **agreement; is that correct?**

23       A    Yes, it was.

24       **Q    And it was also signed on pages 10 and 11 by**

25   **each and all of the Amendolas, that is, Brett, Janet,**

Page 65

1    Roger, and Maureen, correct?

2         A    Yes, it was.

3         Q    And it was also signed on behalf of Brevon

4    Developers by Maureen Amendola, correct?

5         A    Correct.

6         Q    Now I want to turn your attention first, if

7    you would, to page three of Exhibit 17 in paragraph 4.3

8    if you can take a look at that for a moment.

9         A    Okay.

10        Q    This says, Mr. Shoemaker, that "within seven

11   days of the execution of this agreement the property

12   will be conveyed to a limited liability company to be

13   formed, Newco.  Newco shall be managed company and

14   shall have multiple managers."

15             It says that "Acme Real Estate, LLC, a wholly

16   owned subsidiary of the bank shall be a manager of

17   Newco and that the operating agreement of Newco shall

18   be subject to the bank's approval and it's sole

19   discretion and shall contain provisions which, among

20   others require unanimous approval of the managers in

21   order to place Newco into bankruptcy proceedings."

22             Do you see those terms?

23        A    Yes.

24        Q    Were you familiar with those and had you

25   negotiated those during the context of negotiation and

Page 66

1   **execution of this forbearance agreement?**

2       A    Yes, specifically these terms.

3       **Q    Can you tell me, please, how these terms arose**

4   **and were developed in connection with the bank's**

5   **agreement to undertake and execute the forbearance**

6   **agreement?**

7       A    At this time I think we'd already seen three

8   serial bankruptcies and very little progress being made

9   on the house.  We felt it critical to stop that process

10  of serial bankruptcies and try to get some control of

11  the situation.

12          And this was the only way we were going to

13  proceed.

14      **Q    And in fairness to everybody involved the**

15  **forbearance agreement also provided for payments to the**

16  **bank.  There was an attempt during this stage to work**

17  **this out, wasn't there?**

18      A    We were always available and we tried

19  everything we could and we worked with them as well as

20  we professionally could.

21      **Q    How important to the bank was this particular**

22  **provision in section 4.3 of the forbearance agreement**

23  **providing for the effective approval or consent of the**

24  **bank with respect to any filing of bankruptcy for**

25  **Newco?**

Page 67

1      A      Without it we would not have entered into a

2    forbearance with the borrowers.

3      **Q      Now I just want to make sure that we're clear**

4    **and we have the record straight.  The agreement says**

5    **that Acme Real Estate, LLC, a wholly owned subsidiary**

6    **of the bank shall be a manager of Newco.**

7            **Isn't in fact Acme Real Estate, LLC a wholly**

8    **owned subsidiary of the bank?**

9      A      Yes, it's a single member LLC.

10     **Q      Can you describe to the Court the purpose of**

11   **that entity?**

12     A      It is married to hold real estate outside of

13   the bank.  It could be REO or other assets of the bank.

14     **Q      Asset real estate either reacquired by REO or**

15   **otherwise through the bank's lending practices?**

16     A      Right.

17     **Q      Did the parties actually follow through and**

18   **create this new company?**

19     A      No, our attorney actually ended up having to

20   draft this document and draft the operating agreement

21   for the new company.

22     **Q      How were you involved in that?**

23     A      Merely pushing and trying to get that done,

24   and again, trying to meet the terms of the forbearance

25   agreement.

Page 68

1    **Q    This forbearance agreement was signed when, to**

2    **the best of your recollection?**

3    A    In October of --

4    **Q    Of '09, correct?**

5    A    Right.

6    **Q    Would you look at Exhibit 18 for a moment?**

7    **Can you identify that document to the Court briefly?**

8    A    This is the operating agreement for the real

9    estate holding company that was mentioned in the

10   forbearance agreement.

11   **Q    And that's RMAA Real Estate Holdings, LLC,**

12   **correct?**

13   A    Correct.

14   **Q    That's the debtor before the Court today; is**

15   **that correct?**

16   A    Yes.

17        MR. O'DONNELL:  Your Honor, move Exhibit 18.

18        MR. FOREST:  No objection, Your Honor.

19                        (The item referenced above,

20                        previously marked as

21                        Movant's Exhibit No. 18, was

22                        received into evidence.)

23        THE COURT:  Eighteen is admitted.

24        MR. O'DONNELL:  Thank you.

25        BY MR. O'DONNELL:

Page 69

1      Q      And Mr. Shoemaker, if you know who prepared

2  Exhibit 18?

3      A      Our attorney did.

4      Q      And at whose direction and under whose

5  supervision?

6      A      Under mine.

7      Q      Did you approve the final form of this

8  document before it was presented to the parties for

9  execution?

10     A      Yes, I did.

11     Q      And in fact, at pages 19 and 20 did not each

12  and all of the Amendolas sign and acknowledge this

13  particular document?

14     A      Yes, they did.

15     Q      And I would point out, if we could flip

16  through here real quick, at the bottom of page three at

17  article 2.01 it says "the purpose of the company shall

18  be to own, buy, sell, invest in, in other words deal

19  with the property at 18688 Overlook Court, Leesburg,

20  Virginia."  Do you agree with that statement?

21     A      Yes.

22     Q      And if we turn to page seven of the operating

23  agreement down at the bottom, "the provision deals with

24  the election of managers and identifies that the

25  members hereby unanimously elect Acme Real Estate, LLC

1    and Roger Amendola as the initial managers of the

2    company."  Do you agree with that?

3        A    Yes.

4        Q    And that was consistent with the provisions of

5    the forbearance agreement, was it not?

6        A    Yes, it was.

7        Q    In fact, required in order to comply with the

8    terms of that agreement; is that correct?

9        A    Yes.

10       Q    And if you would look at page eight I want to

11   direct your attention to paragraphs 5.03 and 5.04, 5.03

12   indicates that "for so long as Access National Bank is

13   a creditor of the company and has not consented

14   otherwise in writing, Acme Real Estate, LLC shall be a

15   manager of the company."  Do you see that?

16       A    Yes.

17       Q    Why was that important?

18       A    We needed to remain in the transaction.

19   Again, going down to the next paragraph it says, "in

20   order for the entity to be put into bankruptcy requires

21   unanimous consent from the managers, one of which needs

22   to be the bank."

23            Our thought was, as long as we're a manager

24   this thing won't end up back in bankruptcy.

25       Q    And you would be manager as long as Access was

Page 71

1    extended with respect to the loan secured by the

2    property?

3        A    Yes.

4        Q    Did the Amendolas comply thereafter with the

5    terms of the forbearance agreement?

6        A    No.

7        Q    What happened after that?

8        A    The payments did not come in on time.  The

9    injection of capital into the construction of the home

10   stopped.  It seemed like we were right back where we

11   were six months before, before we negotiated the

12   forbearance agreement.

13       Q    Did the bank decide at that point to commence

14   foreclosure processes again?

15       A    Yes.

16       Q    Did ultimately it notice a foreclosure in

17   March of 2008?

18       A    Yes, we did.

19       Q    Do you know what happened in March of 2010 to

20   cause the bank to withdraw that initial foreclosure

21   attempt?

22       A    The borrowers provided a contract on the house

23   to sell it.

24       Q    Okay, and did you review and approve that

25   contract?

1      A      I reviewed it and I had verbal discussions

2    with the borrowers that it would be acceptable as long

3    as the initial down payment of $400,000 was received as

4    called for in the contract.

5         **Q      Did you ever have any discussions with the**

6    **Amendolas, any one of them about whether or not the**

7    **proposed purchaser actually performed under the**

8    **contract by posting the required deposit money?**

9         A      Yes.

10        **Q      What did they tell you?**

11        A      They told me the deposit had not been made.

12   They were trying to work out other things and it became

13   clear to me that the buyer was not willing to settle on

14   the purchase contract.

15        **Q      What did you decide to do after that, Mr.**

16   **Shoemaker?**

17        A      We had no choice but to foreclose.

18        **Q      And I would ask you, if you would please, to**

19   **look at Exhibit number 20.  Did you authorize the**

20   **foreclosure sale that was noticed by Mr. Harvill for**

21   **May 24th, 2010?**

22        A      Yes.

23        **Q      And you heard Mr. Harvill's testimony earlier**

24   **about the fact that that sale was knocked down to a to**

25   **be formed LLC?**

Page 73

1      A    Yes.

2      Q    Did you agree with his testimony earlier about

3    the conduct of that transaction?

4      A    Yes.

5      Q    And after that sale failed what did you do?

6      A    I told them, let's foreclose again.

7      Q    Would you look at Exhibit 21?  That's Mr.

8    Harvill's notice of a June 23rd foreclosure.  Did you

9    authorize Mr. Harvill to commence and effect a

10   foreclosure sale at the property on that date?

11     A    Yes, I did.

12     Q    What happened at that time?

13     A    The property was put into -- RMAA was put into

14   bankruptcy.

15     Q    RMAA, and if you look at Exhibit number 22 do

16   you recall ever seeing that petition?

17     A    Yes.

18     Q    That's the involuntary in the first case, is

19   it not?

20     A    Yes.

21     Q    And if you look at it, that's signed by the

22   Amendolas, Roger Amendola, Brett Amendola, and Janet

23   Amendola as members of the LLC, right?

24     A    Right.

25     Q    Each and every one of them also signed the

Page 74

1   **forbearance agreement, correct?**

2       A    Yes.

3       **Q    And also signed the operating agreement?**

4       A    Yes.

5       **Q    Were you surprised to see this document, this**

6   **filing?**

7            MR. FOREST:  Objection, Your Honor.  Whether

8   the witness is surprised is immaterial.

9            MR. O'DONNELL:  I'll rephrase, Your Honor.

10           BY MR. O'DONNELL:

11      **Q    What was your reaction to the filing of RMAA**

12  **into an involuntary by the Amendolas?**

13      A    Shocked and a little bit disgusted.

14      **Q    Why?**

15      A    And again, we're a community bank where we try

16  to make sure that we're doing good business.  This is a

17  loan that we had on the books for three years.  We did

18  everything we could to give them an opportunity to

19  perform.

20           We had agreements that this wouldn't happen

21  and it happened.

22      **Q    Was Acme or Access or any of its officers to**

23  **the best of your knowledge ever consulted or was there**

24  **permission requested by any of the Amendolas to effect**

25  **this filing evidenced at Exhibit number 22?**

Page 75

1       A    No.

2       **Q    Had Acme been requested would you have been**

3  **authorized to provide consent?**

4       A    I would have been authorized but I would not

5  have given consent.

6       **Q    And that was the purpose of the forbearance**

7  **agreement in the first place, wasn't it?**

8       A    Yes.

9       **Q    What happened after that, after the**

10  **involuntary, the first involuntary was filed?**

11       A    We foreclosed again.

12       **Q    You secured a dismissal of the case first; is**

13  **that correct?**

14       A    Yes, we did.  We got the dismissal.  Then we

15  told Mr. Harvill to foreclose one more time.

16       **Q    And that at Exhibit number 23, is**

17  **Mr. Harvill's notice for August 3rd of 2010 and you**

18  **authorized him to commence and effect that foreclosure?**

19       A    Yes.

20       **Q    And what happened at that stage?**

21       A    It was put into involuntary again.

22       **Q    And that again is the petition at Exhibit**

23  **number 24, if you look for that for a moment.  That's**

24  **signed by Brevon Developers by Roger Amendola, and by**

25  **Brett Amendola; do you see that?**

Page 76

1      A    Yes.

2      **Q    And each and every one of those individuals**

3  **and entities signed off on the forbearance agreement,**

4  **correct?**

5      A    Yes.

6      **Q    What was your reaction to this filing?**

7      A    I guess it was more of the same.  I mean, I

8  was disappointed in the fact that last October we

9  didn't go ahead and try to pursue the foreclosure then.

10  Maybe we would have even been further along today than

11  where we are.

12      **Q    Was the consent of Acme requested in any way,**

13  **shape, or form by any of the Amendolas with respect to**

14  **this most recent filing of the involuntary petition?**

15      A    No.

16          MR. O'DONNELL:  That's all I have right now,

17  Your Honor.

18          THE COURT:  Thank you.

19                  CROSS EXAMINATION

20          BY MR. FOREST:

21      **Q    Mr. Shoemaker, is the consent of any of the**

22  **Amendolas required to file an involuntary petition**

23  **against RMAA?**

24      A    Is the consent required?  I'd need to go back

25  and review the operating statement, operating

Page 77

1   agreement.  Would you like me to do that?

2       **Q    I'd like you to answer the question.  If you**

3   **would please review whatever you need to do that.  Not**

4   **to distract your attention but I think you'd want to**

5   **review paragraph 5.04.**

6       A    It was number 18, right?

7       **Q    Yes.**

8       A    And you were pointing me to what page?

9       **Q    I was asking you the question generally**

10  **suggesting that you might want to review paragraph**

11  **5.04.**

12      A    5.04.

13          MR. O'DONNELL:  And Your Honor, I just want to

14  be clear.  The question is, is the Amendolas consent

15  necessary to file a bankruptcy?

16          MR. FOREST:  You know, I realize that I may

17  have asked that the wrong way but I'll rephrase the

18  question.

19          BY MR. FOREST:

20      **Q    Was Access' consent or Acme's consent?**

21          THE COURT:  To an involuntary?

22          MR. FOREST:  I'm sorry?

23          THE COURT:  To an involuntary.

24          MR. FOREST:  Yes.

25          THE WITNESS:  To an involuntary.  It says,

Page 78

1    "the unanimous consent of all managers shall be

2    required to either file bankruptcy petition or sell,

3    transfer, or encumber the real property."

4            So all managers must consent, "shall be

5    required," the unanimous consent and Acme Real Estate

6    was one of the managers.

7            BY MR. FOREST:

8    **Q    So that language you just read is the basis**

9    **for your answer that consent was required?**

10   A    Consent is required, right.

11   **Q    Are you familiar with the price which the sale**

12   **was knocked down on the May 24th sale?**

13   A    I believe it was $3,350,000.

14   **Q    Did you attend that sale?**

15   A    Yes, I did.

16   **Q    Approximately how many bidders participated in**

17   **the sale?  How many people made bids?**

18   A    Active, three, I believe.

19   **Q    And who were those three?**

20   A    Actually, including the bank it was four.

21   There was myself, the gentleman who actually won the

22   bid, there was one third party buyer, and the

23   subordinate lien holder.

24   **Q    What did the bank -- what was the bank's best**

25   **and final bid at that sale?**

Page 79

1       A       It was our debt.  It was our payoff.

2       **Q       Which was approximately?**

3       A       Two point two at that time, $2.2 million.

4       **Q       And of the four people you identified was the**

5       **bank the first person to drop out?**

6       A       Yes.

7       **Q       Who was the third party purchaser; where did**

8       **he or she drop out?**

9       A       Around $2.6 million.

10      **Q       And the next person who dropped out was, if**

11      **you could identify that person?**

12      A       The subordinate lien holder.

13      **Q       And where did he or she drop out?**

14      A       Probably $3,325,000.

15              MR. FOREST:  Your Honor, I have a document I'd

16      like.

17              THE COURT:  All right, hand that up, please.

18              MR. FOREST:  I have a copy.

19              THE COURT:  For the witness?

20              MR. FOREST:  For the witness and if we could

21      just, I don't know whether the Court prefers to

22      identify those by letters.  If so I would propose

23      Defendant's A.

24              THE COURT:  It will be A.

25      //

Page 80

1                                        (The item referenced above

2                                        was marked for

3                                        identification as

4                                        Defendant's Exhibit A.)

5          BY MR. FOREST:

6       **Q    Sir, could you take a look at that document**

7    **and let me know when you've had an opportunity to do**

8    **so?**

9       A    I've reviewed it.

10      **Q    Prior to today have you seen this document?**

11      A    Yes, I have.

12      **Q    Do you recall the time that you saw this?**

13      A    It was in March of this year.

14      **Q    When I say "you" I'm not trying to ignore the**

15   **distinction between Acme and Access Bank but did**

16   **Access -- when I say "you" did either Access or Acme**

17   **approve this contract?**

18      A    Not formally in writing.

19      **Q    Did you have any objection to this contract**

20   **proceeding?**

21      A    No.

22      **Q    Is this the contract that you spoke about in**

23   **your testimony a few moments ago?**

24      A    Yes.

25      **Q    Could you take a look at paragraph four of the**

Page 81

1   second page?

2       A    Okay.

3       Q    Do you know whether that $60,000 deposit was

4   paid?

5       A    Do not.

6       Q    Now let me draw your attention to the, I

7   believe the 30th or the 31st of March this year.   On

8   one of those days was there a scheduled foreclosure

9   sale?

10      A    I believe there was.

11      Q    And you agree that that sale did not proceed?

12      A    That's correct.

13      Q    Why did that sale not proceed?

14      A    We had a contract, this contract.

15      Q    Was there -- did the, and I say the Amendolas

16  but I would want to include RMAA but did the Amendolas

17  or RMAA make a payment to Access Bank to persuade

18  Access not to proceed with the foreclosure?

19      A    I believe they may have.   I don't know for

20  sure.

21      Q    Did they make a payment of $80,000?

22      A    They may have.   I don't remember.

23      Q    But do you agree that they made some payment?

24      A    I believe they did.   I don't have the

25  transcript in front of me so I don't know for sure.

Page 82

1    **Q    Do you recall the last payment that was made**

2  **on this loan?**

3    A    No.  It was in March.  That's all I remember

4  and it could have been the $80,000.  I'm not saying it

5  wasn't.

6    **Q    But if there was a payment made on March or**

7  **April -- excluding the $80,000 payment was there**

8  **another payment made?**

9    A    I don't believe so.

10    MR. FOREST:  Your Honor, I just want to show

11  one document to Counsel before I approach the witness

12  with it.

13    THE COURT:  All right.

14    MR. O'DONNELL:  Does he want me to hand it?  I

15  don't know what we're waiting on.

16    MR. FOREST:  I'm sorry, Your Honor, I was

17  giving him a chance to --

18    MR. O'DONNELL:  What relevance does that have

19  to 2010?  It's not a 2010 statement.

20    MR. FOREST:  Your Honor, I'd like to mark this

21  and I only have one copy and would propose just to mark

22  it as Exhibit B.  If I could pass it to the Court, it's

23  my only copy.  I need to let the witness have it.

24    THE COURT:  Hand it up here first and then

25  we'll give it to the witness.  Let me see it.

Page 83

1          All right.

2          MR. FOREST:  Your Honor, may I approach the

3    witness?  I just want to review the letter.  Perhaps I

4    can come --

5          THE COURT:  Actually, you can ask him.  If you

6    can't then I'll let you go up there.

7          BY MR. FOREST:

8    **Q    Sir, in the top right hand corner of the**

9    **letter you see some information that refers to the**

10   **balance of the loan, I believe at the beginning of**

11   **2009?**

12   A    Right.

13   **Q    Is it 2009?**

14   A    Right.

15   **Q    What was the balance at the beginning of 2009**

16   **according to that document?**

17   A    $2,027,621.95.

18   **Q    And what was the balance as of December 31st,**

19   **2009 according to that document?**

20   A    $1,731,958.50.

21   **Q    You can set that down, sir.**

22   A    Okay.

23   **Q    I don't have anything else on that right now.**

24   **Do you recall the amount of payments that were made to**

25   **Access National Bank following the forbearance**

Page 84

1    agreement?

2        A    No, I do not.

3        Q    And sir, you had testified that within the

4    first bankruptcy proceeding that was initiated for RMAA

5    earlier this -- I shouldn't say "earlier" -- I believe

6    this June?

7        A    Right.

8        Q    You testified that RMAA made no effort to

9    reorganize?

10       A    Right.

11       Q    Was RMAA provided an effort to do so?

12       A    No.

13       Q    Why not?

14       A    The case was dismissed.

15       Q    On whose request?

16       A    Our attorneys.

17       Q    Do you recall the term of the forbearance

18   agreement?

19       A    No, I don't.

20       Q    Do you have the white book up there?

21       A    Yes, I do.

22       Q    Could you take a look at Exhibit 17, paragraph

23   3.3?

24       A    It was supposed to expire on October 1st, 2010

25   or on the occurrence of an event of default.

Page 85

1       Q     Are you aware of whether RMAA has the ability

2    to provide adequate protection payments to Access?

3       A     RMAA, the only asset I know that holds is the

4    real estate.  I would say that it's not.

5       Q     I understand that, sir, but are you aware of

6    whether RMAA has the ability to provide adequate

7    protection payments?

8       A     No.

9             MR. FOREST:  Your Honor, I have no other

10   questions for this witness but I would reserve the

11   right to call Mr. Shoemaker in our case.

12            THE COURT:  Now, did you want either Exhibit A

13   or B admitted?

14            MR. FOREST:  Not at this time.

15            THE COURT:  Very well.  Mr. O'Donnell,

16   anything further?

17            MR. O'DONNELL:  No, Your Honor.

18            THE COURT:  All right, thank you.

19            THE WITNESS:  Thank you.

20            MR. O'DONNELL:  Your Honor, if I could call

21   Gilbert Rogers I'll be very brief.

22            THE COURT:  All right.  Would you come on up

23   to the Deputy Clerk's desk to be sworn, please?

24   //

25   //

Page 86

1          Whereupon,

2                         GILBERT ROGERS

3          was called as a witness on behalf of the

4    Creditor and, having been first duly sworn, was

5    examined and testified as follows:

6                      DIRECT EXAMINATION

7          BY MR. O'DONNELL:

8     **Q     State your name and business address, please.**

9     A     Gilbert Rogers.

10    **Q     Your business address?**

11    A     7880 Backlick Road, suite seven in

12   Springfield, Virginia.

13    **Q     And Mr. Rogers, your occupation, please?**

14    A     I am a Residential Real Estate Appraiser.

15    **Q     Are you licensed in the Commonwealth of**

16   **Virginia?**

17    A     I am certified in the Commonwealth of

18   Virginia, yes.

19    **Q     And is the bulk of your experience in the**

20   **Northern Virginia area in residential real estate?**

21    A     I have been doing appraisals since 1992 and I

22   have probably done in excess of 8,000 appraisals in

23   that time, all residential.

24          MR. O'DONNELL:  Your Honor, Mr. Forest and I

25   have agreed to just stipulate as to Mr. Rogers'

Page 87

1    qualification as an expert to testify on the valuation

2    of residential real estate.

3         THE COURT:  Based on that stipulation I'll

4    approve him as an expert in --

5         MR. O'DONNELL:  Save us some time.

6         BY MR. O'DONNELL:

7    **Q     Mr. Rogers, in the book in front of you would**

8    **you look at Exhibit number seven?  Can you identify**

9    **that exhibit, please?**

10   A    It is the appraisal that I prepared for the

11   subject property.

12   **Q     When did you prepare this?**

13   A    The effective date of the appraisal is August

14   6th of this year and the signature date on the

15   appraisal is August 10th of this year.

16   **Q     And are you familiar with this property?**

17   A    From an exterior inspection, yes, I am.

18   **Q     And from any other source?**

19   A    From previous appraisals done by other

20   appraisers in our office.

21   **Q     In fact, in preparation for this report you**

22   **reviewed those also?**

23   A    Yes, I did and I included some of the

24   information regarding the interior of the property in

25   this report since I did not have the advantage of

1   seeing the interior.

2       **Q    Can you tell me, please, what valuation**

3   **methodology was utilized by you in order to prepare the**

4   **estimate of value or opinion of value?**

5       A    I used the scales comparison approach.

6       **Q    And the reason for that, sir?**

7       A    The reason for that is that, well, first of

8   all I considered the cost approach but the difficulty

9   in determining a cost to construct when you don't have

10  the advantage of seeing the inside would make it very

11  unreliable.

12          The scales comparison approach is the most

13  reliable and the most accepted methodology for

14  appraising residential properties.

15      **Q    And did you ultimately arrive at an opinion of**

16  **value with respect to the property?**

17      A    I did.

18      **Q    Can you tell the Court what that opinion is?**

19      A    That opinion is $2,450,000.

20      **Q    Where is that reflected in the appraisal**

21  **report?**

22      A    That's at the bottom of page two.

23          MR. O'DONNELL:  Thank you.  Your Honor, I move

24  Exhibit number seven.

25          THE COURT:  Without an objection it will be

Page 89

1    received.

2            MR. FOREST:  Your Honor, I want to -- Your

3    Honor, my objection is that I don't know the extent to

4    which that the Court is going to consider this the

5    preliminary and final hearing and I'm just trying to

6    preserve my point here, that we attempted to get

7    appraisals of our own, weren't able to get one for

8    today so I just want to state that as an objection.

9            THE COURT:  I don't think that goes to the

10   objection -- or the admissibility of a document itself

11   and I --

12           MR. FOREST:  I understand but --

13           THE COURT:  I understand the argument and

14   you're certainly free to make that at any closing as

15   may be appropriate.

16           MR. O'DONNELL:  That's all I have for Mr.

17   Rogers.

18           THE COURT:  Thank you.  Did you have any

19   cross-examination of the appraisal?

20           MR. FOREST:  Your Honor, no questions.

21           THE COURT:  Did you just use two comparables?

22           THE WITNESS:  I'm sorry?

23           THE COURT:  How many comparables did you use

24   on this?

25           THE WITNESS:  I used three.

Page 90

1            THE COURT:  Three.  All right, I see the

2    Ashburn, Leesburg, and Great Falls properties?

3            THE WITNESS:  Yes, sir.

4            THE COURT:  All right, thank you very much.

5            THE WITNESS:  Thank you.

6            THE COURT:  Can he be excused?

7            MR. O'DONNELL:  He may be excused, Your Honor.

8            THE COURT:  May he be excused?

9            MR. FOREST:  Yes.

10           THE COURT:  Thank you for coming, Mr. Rogers.

11   You're free to leave.

12           MR. O'DONNELL:  Your Honor, I might have one

13   or two questions for Mr. Amendola.  In order to try and

14   move this along I'd be willing to just address those

15   during my cross-examination.

16           I don't know how we want to proceed but I'm

17   trying to keep it as quick as possible.  Other than

18   that I have nothing else.

19           THE COURT:  That will be fine.  Mr. Forest?

20           MR. FOREST:  Your Honor, I would call Brett

21   Amendola.

22           THE COURT:  All right, if you'll come forward,

23   please, to be sworn.

24           MR. FOREST:  Your Honor, at this time I would

25   move in my A and B.

Page 91

1          THE COURT:  Any objection to A or B, Mr.

2   O'Donnell?

3          MR. O'DONNELL:  Your Honor, I'm going to

4   object, yes.  A, if it were going to come in would only

5   come in, in order to identify the fact that this was a

6   contract that Mr. Shoemaker was talking about.

7          It would come in for no other substantive

8   effect.  If he wishes to utilize it for some other

9   effect including the fact that it may be operative

10  there are other issues with respect to foundation and

11  authenticity that will have to be overcome in order to

12  be able to admit it.

13         THE COURT:  What's the purpose of the?

14         MR. FOREST:  Your Honor, I'll withdraw my

15  motion on A at this time.

16         THE COURT:  All right, and then B?

17         MR. O'DONNELL:  B, I don't think it was

18  authenticated by the witness, Your Honor.  He showed it

19  to him and asked him to read from it which he did but

20  he didn't identify it or authenticate it so it's a

21  statement issued to one of the Amendolas I think it

22  probably gets authenticated through them.

23         It may be that Mr. Amendola can authenticate

24  that but it does not appear to have been properly

25  authenticated by Mr. Shoemaker.

Page 92

1            THE COURT:  I think that's right.

2            MR. FOREST:  I'll withdraw B as well at this

3    time.

4            THE COURT:  Well, you're not withdrawing it.

5    You're just going to withdraw the motion to admit it.

6            MR. FOREST:  Withdrawing the motion.

7            THE COURT:  You're certainly welcome to renew

8    that motion if you wish.  All right, please be sworn.

9            Whereupon,

10                       BRETT AMENDOLA

11           was called as a witness on behalf of the

12   Defendant and, having been first duly sworn, was

13   examined and testified as follows:

14                     DIRECT EXAMINATION

15           BY MR. FOREST:

16      Q    **State your name for the record, please.**

17      A    Brett Amendola.

18      Q    **And your address, please?**

19      A    43605 Solheim Cup Terrace, Ashburn, Virginia

20   20147.

21      Q    **What is your relationship to Roger Amendola?**

22      A    He is my father.

23      Q    **And the two other members of RMAA Associates**

24   **are your mother and your wife?**

25      A    That's correct.

Page 93

1      **Q      Each of you holds a 25 percent interest in the**
2  **company?**

3      A      That's correct.

4      **Q      Let me draw your attention to March of 2010.**
5  **Was there a foreclosure sale that was scheduled?**

6      A      Yes, sir.

7      **Q      And do you know whether that foreclosure sale**
8  **proceeded to fruition?**

9      A      It did not.

10     **Q      Did you take any steps to persuade Access Bank**
11 **to terminate that foreclosure proceeding?**

12     A      During the month of March we had received a
13 second offer on the property in the form of a formal
14 contract.  We discussed with the bank in depth that we
15 were hoping to execute it because the price was
16 sufficient to satisfy all of the lien holders.

17            And in addition to ratifying the contract and
18 binding it we had made a rather large payment to the
19 bank.

20     **Q      And approximately how much did you pay to the**
21 **bank?**

22     A      $80,000.

23     **Q      And at that time had the bank requested a**
24 **higher amount?**

25     A      Yes.

Page 94

1      Q      How much had they requested?

2      A      $104,000.

3      Q      I assume then that you did not pay the

4   additional $24,000?

5      A      No, sir.

6      Q      So based upon the $80,000 and the contract the

7   bank terminated that sale proceeding?

8      A      That is correct.

9      Q      And they did so voluntarily?

10     A      That is correct.

11     Q      Are you familiar with, you've heard of the

12  forbearance agreement that we've all discussed here

13  today?

14     A      Yes, sir.

15     Q      Are you familiar with the payments that were

16  made by RMAA after the forbearance agreement was

17  executed?

18     A      Yes, sir.

19     Q      Do you recall the approximate amount of

20  payments that were made?

21     A      Yes, sir.

22     Q      What were those amounts?

23     A      There were two forms.  The first form was to

24  Access National Bank in accordance with the forbearance

25  and that was $50,000 per month.

1          That began in October when we executed the

2    forbearance and we had subsequently made October,

3    November, December, January, and the February and March

4    payments were part of that $104,000 of which we paid

5    $80,000 so a total of $280,000 was paid to the bank

6    after the forbearance was signed off on.

7          **Q    Now drawing your attention back to the**

8    **contract do you have a copy of that in front of you by**

9    **chance?**

10         A    I do, sir.

11         **Q    If you would -- there are some initials on**

12   **each of the pages.  Do you see where it says, "please**

13   **initial, seller"?**

14         A    Yes, sir.

15         **Q    Do you recognize those initials?**

16         A    I do.

17         **Q    Whose initials are those?**

18         A    My father's.

19         **Q    And if you look at page 10 of 10 is that your**

20   **father's signature there as well?**

21         A    Yes, sir.

22         **Q    Now before this contract was signed -- strike**

23   **that.  Who is Todd Tarring?**

24         A    Todd is the second trust holder.

25         **Q    Before this contract was signed by your father**

Page 96

1    **did you or anyone at RMAA have any discussions with**

2    **Todd Tarring?**

3         A    Yes, we did.

4         **Q    And did those discussions involve determining**

5    **what balance was due or the amount that he would accept**

6    **on this --**

7         A    It did.

8              MR. O'DONNELL:  Objection --

9              MR. FOREST:  -- payment of this loan?

10             MR. O'DONNELL:  Objection, hearsay.

11             THE COURT:  You're going to ask him how much?

12             MR. FOREST:  No.

13             THE COURT:  Okay.  He knows how much.  He's

14   not going to tell me.  Go ahead.  I think your

15   objection was premature, Mr. O'Donnell.

16             BY MR. FOREST:

17        **Q    Based on the discussions that you had -- did**

18   **you have those discussions with Mr. Tarring?**

19        A    I did.

20        **Q    And based on those discussions were you**

21   **comfortable that this property could be sold for**

22   **$4,150,000 and satisfy Mr. Tarring's lien?**

23             **MR. O'DONNELL:  Objection, hearsay, Your**

24   **Honor.  I mean, we're getting around --**

25             THE COURT:  I do think that.

1            MR. O'DONNELL:  If I can't do it through my

2      expert witness he can't come around the other corner.

3            THE COURT:  With his lay witness.  Isn't the

4      foundation of the answer to his based on hearsay?  I

5      accept -- I don't think there's any -- well, did you

6      believe that this contract would pay everyone off?

7            THE WITNESS:  Yes, sir.

8            THE COURT:  I think that's all that you need.

9            MR. O'DONNELL:  Then why doesn't my letter

10      where Mr. Tarring says his claim is $4,000,000 come in,

11      Your Honor?  I mean, if they're going to get that in

12      there should be a quid pro quo.

13            That's hearsay.  It's pure hearsay.

14            THE COURT:  Yeah, how much weight am I going

15      to give it?

16            MR. O'DONNELL:  Okay.

17            THE COURT:  He may believe that for whatever

18      reason but he is not the second trust holder and I

19      don't have a payoff statement from him which would do

20      that but he obviously entered into the contract with

21      some expectation.

22            If it was clearly insufficient there had to be

23      some arrangement or something but I don't know what

24      it's worth but he thought the contract would have been

25      sufficient, is his testimony.

1          MR. FOREST:  That's what I'm --

2          THE COURT:  All right.

3          BY MR. FOREST:

4      **Q     And you provided a copy of this contract to**

5  **Mr. Shoemaker?**

6      A     Yes, sir.

7      **Q     And to your knowledge is this a true and**

8  **accurate copy of the contract between RMAA and Ms.**

9  **McManis?**

10     A     It is.

11         MR. FOREST:  Your Honor, I would move

12  Defendant's Exhibit A in at this time.

13         MR. O'DONNELL:  Let me state my objections,

14  Your Honor.  They are multiple.  To the extent that

15  they offer it in evidence to be able to establish the

16  agreement of any third party to purchase the property

17  at any agreed price, it is hearsay.

18         It is therefore inadmissible.  To the extent

19  that they simply offer to suggest that they have had

20  discussions with somebody I suppose it might be

21  acceptable.

22         However, this witness cannot authenticate the

23  contract, Your Honor, and they cannot authenticate it

24  for the following reason.  RMAA who is the purported

25  seller under the contract is a manager managed entity,

1    Your Honor.

2              It is not run, operated, or managed through

3    its members.  The witness is a member only.  He is not

4    the manager or a manager of RMAA, neither is he the

5    signatory to the contract either in an individual or

6    representative capacity.

7              The signatory to the contract purportedly on

8    behalf of RMAA is Roger Amendola who is a manager of

9    the entity, is authorized to act on behalf of the

10   entity, and through whom the document could be

11   authenticated properly for the purposes of admission

12   under the federal rules of evidence.

13             I think for the reason that it is hearsay and

14   that it has a lack of proper authentication and

15   foundation it does not come in.

16             MR. FOREST:  Your Honor, if I may respond in

17   part to that.  The one difficulty that we have today is

18   that Mr. Amendola is in Maine as we speak because his

19   sister was diagnosed with stage four cancer.

20             He had to go up there and assist her.  I

21   certainly would want to move the evidence in

22   substantively as evidence and I don't mean to get --

23             THE COURT:  Well, the authenticity only goes

24   as, is this a contract that was executed.  It need not

25   be authenticated by a signatory to that or a member.

Page 100

1           It just needs to be someone who knows what's

2    going on and says, yes, this is the contract, and if

3    you lay that foundation that's sufficient.  It's not

4    much more than that.

5           MR. O'DONNELL:  What about the hearsay

6    objection, Your Honor?  To the extent that it's being

7    offered and I assume it's being offered to establish

8    that there's --

9           THE COURT:  This is -- it's being offered to

10   show that there was a contract and that this is the

11   contract for what it's worth and you can argue that and

12   it does come in.

13          How else do you do it?  Do you always get the

14   other side of the contract in?

15          MR. O'DONNELL:  I think if the ultimate effect

16   of this or purpose of this is to tell the Court, I've

17   got a $4.1 million contract which my client testified

18   to, was not performed and was dead and that was upon a

19   party admission not hearsay.

20          Then I think you do have to bring the other

21   party to come here and say that.  Otherwise what

22   they're saying is, I want to take this lady's

23   admissions, I want to take her representations that

24   she's willing to buy the property and admit them

25   substantively to the Court to prove that there's a deal

Page 101

1    that's extent or available.  That is hearsay.

2              THE COURT:  The hearsay is overruled.

3              How do you know that this was the contract

4    that was signed?

5              THE WITNESS:  I was actually a party to the

6    negotiations.

7              THE COURT:  Were you there when it was signed?

8              THE WITNESS:  I was.

9              THE COURT:  That's pretty good, Mr. O'Donnell.

10   I think that authenticates it pretty well.

11             MR. O'DONNELL:  Okay, Your Honor.

12             THE COURT:  I'll admit it.

13                              (The item referenced above,

14                              previously marked for

15                              identification as

16                              Defendant's Exhibit A, was

17                              received into evidence.)

18             BY MR. FOREST:

19        Q    **Now, Mr. Amendola, do you know who the selling**

20   **broker was for this transaction?**

21        A    I believe it was Long & Foster.

22        Q    **But do you know the name of the individual,**

23   **the licensee?**

24        A    It was either my mother or my wife, who are

25   both licensed agents with Long & Foster.  I'm not sure.

1   **Q**   **Let me draw your attention to page 10 of 10**

2   **and of course the tenth page of the document.**

3   A   It says "Long & Foster Reston" and it has an

4   agent i.d. number of 14822 but I'm not sure if that's

5   Maureen Amendola or Janet.

6   **Q**   **I'm actually trying to draw your attention to**

7   **the Carthagena Court.**

8   A   Yes, that's --

9   **Q**   **Who's office is at 21109 Carthagena Court?**

10   A   Cora McManis, the purchaser.

11   **Q**   **Was she acting as her own broker?**

12   A   She was.

13   **Q**   **And she is licensed?**

14   A   She is.

15   **Q**   **Was Ms. McManis buying this property in her**

16   **own right or do you know whether she was --**

17   **MR. O'DONNELL:  Objection, Your Honor.  Now**

18   **we're getting into speculating on what the purchaser**

19   **intended to do or thought she was doing and I don't**

20   **think the witness is capable of testifying to that.**

21   THE COURT:  I don't know if he's capable.

22   That goes to foundation as to how he would know that.

23   I don't know that he would know that and I don't know

24   if he would know it on a basis other than hearsay.

25   I don't know that so if you want to do that --

Page 103

1    I think that it is an appropriate course of inquiry.  I

2    don't know where it leads but you still need to lay

3    some foundation as to how he would know that.

4              BY MR. FOREST:

5        **Q     You have met Ms. McManis?**

6        A     Yes, sir.

7        **Q     And you met her as a part of a process where**

8    **she made some inquiry and ended up signing a contract**

9    **for this property?**

10       A     That is correct.

11       **Q     And she was a real estate licensee or broker?**

12       A     That is correct/.

13       **Q     With which company, do you know?**

14       A     I believe she owns her own company, Virginia

15   Select Properties.

16       **Q     Did Ms. McManis perform on this contract?**

17       A     She did not.

18       **Q     Do you know why she did not?**

19       A     I do.

20       **Q     Why is that?**

21             **MR. O'DONNELL:  Can we lay a foundation, Your**

22   **Honor?  Again, I think to the extent that this comes**

23   **about can only be based on hearsay.**

24             BY MR. FOREST:

25       **Q     Do you know whether Ms. McManis performed on**

Page 104

1    **this contract?**

2        A    I do.

3        **Q    What is your source of information?**

4        A    Directly from her.

5        **Q    Did she tell you why she did not perform?**

6        A    She did.

7        **Q    And what did she tell you?**

8            **MR. O'DONNELL:  Objection, hearsay, Your**

9    **Honor.**

10            THE COURT:  I think that is hearsay.  Is there

11    an exception that you're aware of for that?

12            MR. FOREST:  Well, Your Honor, I'd like to

13    make a proffer without cluing the witness in.  Let me

14    withdraw that.  I think I can come to that in a

15    different place.

16            THE COURT:  Very well.

17            BY MR. FOREST:

18        **Q    Did you provide assistance to RMAA Real Estate**

19    **Holdings in other contracts?**

20        A    I did.

21        **Q    Or in other instances where people wanted to**

22    **buy the property?**

23        A    I did.

24        **Q    Were there any difficulties that you faced in**

25    **dealing with these other folks?**

Page 105

1      A      Yes.

2      **Q      What were those difficulties?**

3      A      Because of the significance of the property.

4   It was very well known in the community throughout

5   Loudoun County given the size and kind of history

6   behind it.

7            In trying to ratify a contract for fair market

8   value it was very difficult because of the litigious

9   background, that the property, as everyone has

10   testified was subject to a multitude of previous

11   efforts to foreclose.

12            When a property of this substance -- when it's

13   a buyer's market, real estate market it's difficult and

14   you have a substantive asset like this it is often

15   difficult to get over the stigma associated with the

16   asset.

17            And in negotiating contracts it became very

18   difficult to try to achieve a fair market price when

19   people are under the assumption they could steal it at

20   a foreclosure.

21      **Q      And based on the -- do you recall the name of**

22   **any other individual who expressed interest in**

23   **purchasing the property?**

24            **MR. O'DONNELL:  Hearsay, Your Honor.**

25            THE COURT:  I'll allow the question.  Just the

Page 106

1    question that you've asked, and then we can go from

2    there, Mr. O'Donnell.

3          BY MR. FOREST:

4     **Q    Do you recall the name of any other individual**

5     **you discussed, that you dealt with in terms of selling**

6     **the property?**

7          A    Yes, sir.

8     **Q    And who else did you deal with?**

9          A    There have been calls on a weekly basis

10   regarding the property and its status and we've

11   received in the last six months a total of four written

12   offers of which two came --

13          MR. O'DONNELL:  Hearsay and best evidence

14   rule, Your Honor.

15          THE COURT:  It's overruled.

16          MR. O'DONNELL:  Overruled?

17          THE COURT:  Yeah.

18          MR. O'DONNELL:  We're talking about a written

19   document, Your Honor, that he's received four written

20   offers.  If that comes into evidence that's hearsay to

21   establish that they've actually been made.

22          THE COURT:  No, he's setting the foundation

23   for what he may go on.  He's not asking for the content

24   of them.  At this particular time he's asking for the

25   activity that was out there and that's all that he

Page 107

1   wants to put in.

2          There is a limit to which you can go but at

3   this point he's just getting the activity.

4          BY MR. FOREST:

5     **Q     Okay, let me change gears.  Are you familiar**

6   **with a gentleman by the name of David Caseman?**

7     A     David Caseman, yes, sir.

8     **Q     Who is he?**

9     A     He was an individual that early in 2010

10  submitted a written offer.

11    **Q     And do you recall the amount of that written**

12  **offer?**

13         **MR. O'DONNELL:  Objection, Your Honor, best**

14  **evidence rule.**

15         THE COURT:  It's overruled.

16         THE WITNESS:  $3.8 million.

17         MR. O'DONNELL:  Standing objection, Your

18  Honor.  I understand the Court's ruling.

19         THE COURT:  I understand.  That's fine.

20         MR. O'DONNELL:  I'm not arguing.  I would just

21  like a standing objection on these issues because he's

22  going to ask the same thing.  I don't want to have to

23  interrupt the Court, Your Honor.

24         THE COURT:  All right, that's fine.

25         BY MR. FOREST:

Page 108

1      Q      And do you know whether the discussions with

2   Mr. Caseman bore fruition?

3      A      They did not.

4      Q      Do you know why they didn't?

5             MR. O'DONNELL:   Foundation, Your Honor.   It's

6   going to be hearsay.

7             THE COURT:   You do need to --

8             MR. FOREST:   I'll withdraw that last line.

9             THE COURT:   I'm not quite sure where he'd

10  derive that from other than from the other party.

11            BY MR. FOREST:

12     Q      Is Exhibit B before the?

13     A      No, sir.

14     Q      Now could you in summary terms explain to the

15  Court the actions that RMAA could take to reorganize

16  itself?

17     A      It is our understanding after seeking Counsel

18  that we had a few options available to us in order to

19  try to protect the creditors and the unsecured

20  creditors with this asset, one of which was an

21  involuntary petition as a creditor.

22     Q      Let me try and redirect your question.   In

23  plain English how are you going to get out of this?

24  How is RMAA going to get itself out of the financial

25  troubles that it has?

1      A    We've got two options.  One would be to

2   satisfy all the lien holders to include Access Bank and

3   that can be done through a refinance or through a

4   payoff and the second would be to sell the property.

5      **Q    And could you explain to the Court the means**

6   **that RMAA has to refinance this loan, and by "this**

7   **loan" I mean their first trust loan?**

8      A    Yes, there are multiple options when it comes

9   to the payoff and the refinance, the first being

10  seeking an alternative source of funding to take out

11  the banks.

12          The second would be to utilize our own

13  personal assets as a family to pay off the loan and the

14  third would be, like I had mentioned before ratifying a

15  contract for a price high enough to pay off all of the

16  creditors secured and unsecured.

17     **Q    Now have you identified an individual who**

18  **would be willing to provide financing?**

19     A    I have.

20          MR. O'DONNELL:  It's hearsay, Your Honor.

21          THE COURT:  Neither that question nor the

22  answer is hearsay.  He simply says he knows of a

23  lender.

24          MR. O'DONNELL:  Well, Your Honor, I understand

25  that we sort of leapt beyond the horse and the cart.

Page 110

1   The foundation would have to come about by virtue of

2   asking him, how do you know that there's somebody

3   willing to make it?

4          And the testimony proffered would be that, I

5   know because they said so.  You can't have any other

6   basis for it,.  It has to be hearsay.

7          THE COURT:  It's overruled.  Go ahead, please.

8          BY MR. FOREST:

9   **Q     And does RMAA have any liquid assets that --**

10  **in the immediate future does RMAA have liquid assets**

11  **that would be available to it to help it refinance or**

12  **pay off this note?**

13  A     Yes, sir.

14  **Q     Approximately what sort of funds might be**

15  **available in the near term?**

16  A     Just through transactions that are scheduled

17  to close within the next 30 days, approximately

18  $500,000.

19  **Q     And without testifying as to what Mr. Tarring**

20  **said, based on your conversations with him are you and**

21  **is RMAA willing to proceed with an effort to refinance**

22  **this loan with Access National Bank?**

23  A     Yes, sir.

24  **Q     And likewise, is RMAA willing to proceed to**

25  **simply -- strike that.  Is RMAA willing to proceed with**

Page 111

1   efforts to sell the property on a fair market basis?

2        A    Yes, sir.

3        Q    And is RMAA willing to dedicate substantial

4   assets in terms of dollars, energy, and effort towards

5   meeting either or both of those objectives?

6        A    Yes, sir.

7        Q    Do you know whether RMAA had the ability to --

8   excuse me, do you know whether RMAA was able to put

9   forth a plan of reorganization in the first bankruptcy

10  proceeding that was filed?

11       A    We were able to.

12       Q    A plan of reorganization?

13       A    We weren't able to.  We were trying to.  We

14  were going to.

15       Q    And would the intent of such a plan be to pay

16  all creditors 100 percent?

17       A    Yes, sir.

18       Q    And why is that?

19       A    That's the intent of us as the guarantors.

20            MR. FOREST:  Your Honor, could I, I say

21  withdraw but I think the Court or the Clerk may have

22  Exhibit B.

23            THE COURT:  I think it's up at the witness

24  stand.  You can go look up there if you'd like.

25            BY MR. FOREST:

Page 112

1    **Q**    **Could you identify that document, please?**

2    A    Yes, this is a year end statement from Access

3    National Bank dated December 31st, 2009 in regard to

4    our construction loan with Access National Bank.

5    **Q**    **At the very top of the page does it indicate a**

6    **balance as of January 1st, 2009?**

7    A    It does.

8    **Q**    **What balances does it show?**

9    A    $2,027,621.95.

10   **Q**    **And does that also show a balance as of**

11   **December 31st, 2009?**

12   A    It does.

13   **Q**    **And what balance is set forth there?**

14   A    $1,731,958.50.

15   **Q**    **Do you believe that those numbers are accurate**

16   **as to the balance at the beginning of 2009 and the**

17   **balance at the end of 2009?**

18   A    I do.

19   **Q**    **Do you recall the amount of payments that --**

20   **perhaps not the specific but do you recall the amount**

21   **of payments that were made on this loan during 2009?**

22   A    I'm going to give a range because I don't have

23   the specifics in front of me but I know it was in

24   excess of half a million dollars or $500,000.

25   **Q**    **Would those payments have been spread -- do**

1  **you recall the frequency of those payments?  Were there**

2  **12 equal payments or how did they come about, plus or**

3  **minus?**

4       A    In accordance with this statement it shows

5  payments in February, March, May, two in May, and then

6  October, November, and December so a total of nine

7  payments were made.

8       **Q    And according to that statement do you have**

9  **the -- can you calculate or does that refresh you as to**

10  **the aggregate amount of payments that were made?**

11       A    In total principal that was paid down on the

12  loan it was $295,663.45 but it does not show the

13  interest that was paid on it.

14       **Q    Do you recall the date of the last payment**

15  **that RMAA made on this facility?**

16       A    Yes.

17       **Q    What was that?**

18       A    It was an $80,000 payment on March 30th, 2010.

19       **Q    Could you take a look at Exhibit one in the**

20  **white binder?**

21       A    Yes, sir.

22       **Q    Do you see -- let me draw your attention to**

23  **paragraph 3-B.**

24       A    Yes, sir.

25       **Q    Could you tell the Court what the initial**

Page 114

1    monthly payment was under this loan?

2        A    $16,903.50.

3        Q    If the Court were to grant relief from the

4    stay and allow Access National Bank to foreclose could

5    RMAA put forth a plan of reorganization?

6        A    I'm not sure.  No, we would not be allowed to

7    if they were allowed to foreclose.

8        Q    Now you heard testimony from Mr. Harvill about

9    some, I don't even want to call them liens; memorandums

10   and mechanic's liens that were filed and testimony

11   regarding HOA dues, et cetera, have some of those been

12   entirely satisfied?

13       A    Yes, sir.

14       Q    And have those that perhaps haven't been

15   entirely satisfied been substantially curtailed?

16       A    Yes.

17       Q    Do you know whether there was -- do you know

18   what an MLA is?

19       A    I do not.

20       Q    A mechanic's lien agent?

21       A    Okay, yes, sir.

22       Q    Do you know whether there was a mechanic's

23   lien agent appointed for this?

24       A    There is.

25       Q    And who is that?

Page 115

1     A     Mr. Thomas Wiltshire, Esquire, of Key Title.

2     **Q     Since January 1st of 2009 have you filed for**

3  **bankruptcy?**

4     A     No, sir.

5     **Q     Now Mr. Shoemaker had also testified that they**

6  **wanted some funds paid into a, for lack of a better**

7  **term, construction account.   Were any of those funds**

8  **paid in?**

9     A     Yes, sir.

10    **Q     Do you recall how much was paid in?**

11    A     In the accounting that myself and my father

12  did for Brevon within the last six months I believe --

13  well, within the last nine months since the forbearance

14  was executed, over $250,000.

15    **Q     Where is your father today?**

16    A     In Maine.

17    **Q     Why is he in Maine?**

18    A     My mother and father went up there to help my

19  aunt who was diagnosed with stage four cancer and is

20  having a double mastectomy and some lymph nodes

21  removed.

22    **Q     And following -- have you made an effort to**

23  **get an appraisal, a third party appraisal for this**

24  **property?**

25    A     Yes, upon receiving notice of today's motion

Page 116

1    we have submitted requests for three BPOs, broker

2    opinion letters as well as an additional certified

3    appraisal.

4        **Q    Were you able to obtain any of those?**

5        A    Not this quickly.

6        **Q    How quickly do you believe that RMAA could**

7    **close upon a refinance of the loan with Access National**

8    **Bank?**

9            **MR. O'DONNELL:  Objection, speculation, Your**

10   **Honor.**

11           THE COURT:  Overruled.

12           THE WITNESS:  It would take between 30 and 60

13   days at the longest.

14           BY MR. FOREST:

15       **Q    And is RMAA asking the Court to allow it to**

16   **make adequate protection payments so that RMAA can put**

17   **forth a plan of reorganization?**

18       A    Yes, sir.

19       **Q    And does RMAA have the ability to make**

20   **adequate protection?**

21       A    Yes, sir.

22           MR. FOREST:  Your Honor, I'd move in Exhibit

23   B, Defendant's B.

24           THE COURT:  Any objections?  Show it to Mr.

25   O'Donnell.

1           MR. O'DONNELL:  I just want to make sure.

2    That's in the name of Brett and Janet?  No objection,

3    Your Honor.  It's Mr. Amendola's statement.

4           THE COURT:  All right, it will be admitted.

5                          (The item referenced above,

6                           previously marked for

7                           identification as

8                           Defendant's Exhibit B, was

9                           received into evidence.)

10          MR. FOREST:  No other questions, Your Honor.

11          THE COURT:  Thank you.

12                      CROSS EXAMINATION

13          BY MR. O'DONNELL:

14     **Q    Mr. Amendola, what assets does RMAA own?**

15     A    I believe the only asset that it owns is the

16    single purpose asset which is the home on Riverlook.

17     **Q    It's the house that we're talking about?**

18     A    Yes, sir.

19     **Q    That's all, right?**

20     A    Yes, sir.

21     **Q    There's no other assets of any kind?**

22     A    Correct.

23     **Q    RMAA is not the owner of any contract rights**

24    **or receivables or anything else?**

25     A    No, sir.

Page 118

1      Q    So when you talked earlier with Mr. Forest and

2  said that RMAA has $500,000 of transactions that are

3  set to close over the next 90 days you're not talking

4  about assets controlled by RMAA, are you?

5      A    By the members of RMAA.

6      Q    You're talking about your family members?

7      A    Correct.

8      Q    But they're under no written obligation to

9  contribute any capital to RMAA at this time, are they?

10     A    I don't believe so.

11     Q    With respect to the efforts to refinance or

12 sell the property you really, you could have done that

13 at any time over the past two and a half years, could

14 you not?

15     A    We've been trying.

16     Q    You have?  You've just been unsuccessful

17 during that period?

18     A    That's subject to -- it's a subjective answer.

19     Q    It hasn't occurred yet, correct?

20     A    Correct.

21     Q    Thank you.  And it's correct that there have

22 been no tax payments for the real estate taxes for

23 2008, 2009, and 2010, correct?

24     A    No, that is inaccurate.

25     Q    Tell me, please, what has been paid?

Page 119

1       A    In 2009 we had it reassessed because the

2    property had gone up 40 percent in value when there was

3    no construction being done.  That was done at the

4    beginning of 2010.

5       **Q    Listen to my question.  I asked you, there**

6    **have been no payments of 2008, 2009, and 2010 real**

7    **estate taxes; is that correct?**

8       A    And that is not correct.

9       **Q    Then I asked you, please tell me what payments**

10   **have been made?**

11      A    I know that we had negotiated a payment plan

12   within the last six months and I believe two payments

13   of $5,000 have been made in accordance with that plan.

14      **Q    So approximately $10,000 in total?**

15      A    Correct.

16      **Q    And that other than that the '08, '09, and '10**

17   **tax liabilities are outstanding to the best of your**

18   **knowledge?**

19      A    To the best of my knowledge.

20      **Q    And there have been no payments to Mr. Tarring**

21   **either; is that correct?**

22      A    That is inaccurate as well.

23      **Q    Tell me how much money and when it was paid to**

24   **Mr. Tarring.**

25      A    He's received $75,000 in payments and I

Page 120

1   believe it was in 2008, the end of 2008 is when he

2   received the last payment.

3       **Q    At the end of 2008?**

4       A    Correct.

5       **Q    And a total of $75,000?**

6       A    That is correct.

7       **Q    To the best of your understanding is that**

8   **applied against accrued interest on the note?**

9       A    I don't know how Mr. Tarring accounted for it.

10      **Q    But you understood there to be interest**

11  **accruing on the obligation, correct?**

12      A    Yes.

13      **Q    It is a $1,000,000 note, of the face value?**

14      A    That is correct.

15      **Q    And you understand that to be accruing at five**

16  **percent per month?**

17      A    That's what the note says but that's not what

18  we've been talking about over the last three years.

19      **Q    But you don't have anything in writing to**

20  **indicate that anything other than the note controls; is**

21  **that correct?**

22      A    I have a significant amount of correspondence

23  via e-mail that we've talked about in regards to

24  buyouts or payoffs.

25      **Q    You didn't bring any of that with you today,**

Page 121

1   did you?

2        A    I didn't know that we were going to have a

3   full fledged hearing so I wasn't --

4        Q    You didn't bring any of that today, sir,

5   correct?

6        A    No, sir.

7        Q    And you are familiar with Exhibits 17 and 18,

8   are you not, Mr. Amendola?  That would be the

9   forbearance agreement and the operating agreement of

10  RMAA?

11       A    Yes, sir.

12       Q    And you signed each of those, correct?

13       A    Yes, sir.

14       Q    And you are aware of the provisions requiring

15  the express consent of Acme to affect any bankruptcy

16  filing on behalf of RMAA when you signed both

17  documents, correct?

18       A    Yes, sir.

19       Q    And in fact, when you had discussions with Mr.

20  Shoemaker and the bank representatives about effecting

21  this forbearance, that was an express condition of the

22  bank in terms of entering into the forbearance,

23  correct?

24       A    The bank basically wrote the document and

25  mandated that it was staying as-is.  We had no power to

Page 122

1    change it at all.

2         **Q    Do you remember discussing this with Mr.**

3    **Shoemaker and the bank at that time?**

4         A    I don't recollect.  We just signed it because

5    that was our only option.

6         **Q    Did you read this before you signed it?**

7         A    I did.

8         **Q    You understood it, correct?**

9         A    Yes, sir.

10             MR. O'DONNELL:  That's all I have, Your Honor.

11             THE COURT:  All right, anything further?

12             MR. FOREST:  No other questions, Your Honor.

13             THE COURT:  All right, thank you, you can have

14    a seat.

15             THE WITNESS:  Thank you, Your Honor.

16             THE COURT:  Did you have anything further to

17    present?

18             MR. FOREST:  Your Honor, the only thing that I

19    would have further -- and well, I don't mean to be too

20    lighthearted about it but this is what's left of my

21    raft of hearsay documents.

22             We would just like to have this marked as

23    Exhibit C.  Obviously I'm not even going to pretend

24    I've got the foundation to put it into evidence but

25    this is just my proffer as a part of my -- and I

Page 123

1   hesitate to call it a continuance of the hearing

2   because I understand the Court is going to take

3   appropriate action.

4          But I'm just going to very quickly ask the

5   Court just to take a quick look at --

6          MR. O'DONNELL:  Your Honor, before we start

7   looking at it in substance, Your Honor --

8          MR. FOREST:  Your Honor, I'm not asking you to

9   look at it in substance.  I'm just --

10          THE COURT:  What are you trying to, what's

11   your proffer?

12          MR. FOREST:  My proffer is that we had an

13   appraisal of the property for $5.2 million two years

14   ago.  I certainly understand that that's a long time

15   ago and I certainly understand that things have

16   happened.

17          But I don't just want to blithely ask this

18   Court to keep the record open so that we can put on

19   evidence of a value but we did the best we could to try

20   and get this appraisal updated and weren't able to do

21   so in the short term.

22          So I just want to make that proffer and I'll

23   just leave it at that.

24          THE COURT:  So what you're saying is you've

25   got an appraisal dated March 17th, 2008 at $5.2 million

Page 124

1   and you've endeavored to have it updated but you've not

2   been successful in the short time you've had?

3          MR. FOREST:  I've endeavored to have it

4   updated through Mr. -- and I hate to say I didn't ask

5   Mr. Amendola this but I asked him to contact this

6   individual.

7          I can only assume it's Mr. Lou Lossie and we

8   just weren't able to come up with that today.

9          THE COURT:  All right, I understand.  Anything

10  further, Mr. O'Donnell?

11         MR. O'DONNELL:  No, Your Honor, just argument.

12         THE COURT:  All right, go ahead, please.

13         MR. O'DONNELL:  Thank you.  Your Honor, we've

14  spent a little bit of time on what I might characterize

15  as a detour from our principal grounds for relief.

16         Although we have certainly alleged that there

17  is a lack of equity in the property and that

18  reorganization is not a prospect and I don't know

19  really that I would think that there's any alteration

20  or evidence that would change that perception from my

21  perspective, at least, today.

22         The principal grounds for relief are under

23  (D)(1) and D-4 and I will tell the Court that the

24  emphasis behind the motion that was filed with this

25  Court last week, and the reason for the expedited

1  relief and hearing was because of what we perceive as a

2  pattern of conduct implemented to delay, hinder, and

3  defraud Access and the exercise of its rights.

4       Action that is a basis for relief under D-4,

5  not just with respect to granting relief to the

6  property but to provide effectively in rem relief as to

7  the property and to make that order granting relief

8  binding upon subsequent bankruptcies that might be

9  filed with respect to the property in the future.

10      I want to address (D)(1) and D-4 for a moment.

11  (D)(1), Your Honor, was filed with respect to cause and

12  effectively the allegation and the claim is that cause

13  exists because the petition was filed in bad faith.

14      And Your Honor, when you look at those things,

15  you know, if you look at any individual case it is

16  sometimes hard to look at anything in a vacuum or in

17  the context of that one limited case and have enough

18  information to determine or ascertain that it was filed

19  in bad faith.

20      But the old adage or saying that everyone has

21  20/20 hindsight is applicable here because we have the

22  benefit of hindsight in this case.

23      You have not just the filing of this case,

24  Your Honor, and the circumstances that surround the

25  involuntary petition filed here but you have a history

Page 126

1    and pattern of conduct with four separate filings,

2    dismissals, failures to file verified statements,

3    failure to file statements and schedules required by

4    the Court.

5            You have filings by entities that were not in

6    the chain of title and demands to cease and desist all

7    foreclosure activity.

8            You even have what I would characterize, Your

9    Honor, as a patently incorrect and fraudulent filing

10   immediately preceding this case where this very same

11   group of principals effected a filing against RMAA in

12   their capacity as members where Mr. Forest and the

13   Amendolas signed an involuntary petition and said,

14   "this is a partnership" even though the official form

15   that was approved by Congress now includes a

16   parenthetical under corporation which says, "includes

17   LLC and LLP."

18           Obviously that issue was addressed and dealt

19   with by Judge Mitchell but Your Honor, where you have a

20   history of dilatory filings, where you have no effort

21   or attempt to do anything with those filings other than

22   effect a delay of the foreclosure and I understand they

23   didn't file Chapter 11s in all of the cases, Your

24   Honor.

25           But the evidence that's before the Court is

1    that they clearly did not intend to follow through with

2    any aspect of several of these filings.

3         The filing by Brevon Development was dismissed

4    for failure to file schedules and statements.  That was

5    a voluntary and conscious act by the Amendolas.

6         The filing of Roger Amendola was dismissed for

7    failure to file schedules and statements.  They didn't

8    just fail to effect any attempt to reorganize or effect

9    payment of claims, Your Honor.

10         They failed to properly prosecute the

11   bankruptcy filings themselves.  They got protection and

12   they got the delay of the foreclosure which is what

13   they wanted because each and every one of these prior

14   filings was made the day before or the day of a

15   scheduled foreclosure sale.

16         They were filed without basis and the

17   initially filing of RMAA without basis at law.  Your

18   Honor, I've cited at case to you in the matter of in

19   re:  Bradley which is a Judge Shelley opinion back when

20   he was sitting down in Richmond.

21         And he addressed then the then novel question

22   of whether or not cause under (D)(1) includes a lack of

23   good faith in filing.  Judge Shelley reasoned, and this

24   has been picked up on and continued throughout

25   subsequent cases, that "conduct which would warrant a

Page 128

1    dismissal of the entire Chapter 11 case for cause on

2    the basis of a lack of good faith is sufficient to

3    satisfy the cause requirement for relief from stay

4    under 362(D)."

5           And he went through an analysis of a case

6    where it was a two party dispute.  The entity or the

7    debtor at that time was not engaged in business.

8           And there were filings made that were made

9    immediately preceding a foreclosure or scheduled

10   foreclosure that appeared to be filed for no other

11   purpose other than to delay and stop the foreclosure

12   process.

13          Judge Shelley said that, "it's the opinion of

14   the Court that when a debtor on the eve of foreclosure

15   twice files for relief under Title 11 in order invoke

16   the provisions of 362 and adjoin a creditor's

17   contractual and statutory rights to liquidate its

18   indebtedness."

19          And under the additional circumstances present

20   in this case I said, it's a two party dispute.  The

21   debtor is really not engaged in business which is the

22   same thing here.

23          That cause exists under 362(D) for relief from

24   the automatic stay.  This is particularly true when the

25   debtor has filed for relief under Title 11 three times

Page 129

1   in the last two years and the same creditor has been

2   forestalled from proceeding.

3          Your Honor, we believe that cause exists under

4   362(D)(1) for lack of good faith in the filing of this

5   incident petition.

6          We also submit, Your Honor, I'm going to skip

7   over (D)(2) for a moment and address 362(D)(4) which

8   says, Your Honor, that if the Court finds that "the

9   filing of the petition was part of a scheme to delay,

10  hinder, and defraud creditors that involve multiple

11  bankruptcy filings affecting the same real property

12  that it may grant relief.

13         And it may make that relief in rem relief.

14  Your Honor, I don't know how else we could establish or

15  what additional facts would be required to establish a

16  scheme to delay, hinder, and defraud Access other than

17  the fact pattern that has existed for the last year

18  with respect to this property.

19         We have five filings now.  Not only do we have

20  five filings and an inability or failure to prosecute

21  those filings but we also have foreclosures where the

22  principals of the debtors showed up, submitted bids,

23  and then failed to close under the contracts.

24         And of the five filings, Your Honor, one was

25  legally invalid and insufficient as a matter of law,

Page 130

1   the LLC or partnership filing or RMAA.

2            One entity was not in the chain of title but

3   there were demands from Counsel to cease and desist the

4   foreclosure and you heard Mr. Harvill testify that he

5   felt obligated to do so, so that there was no chance he

6   would violate an automatic stay.

7            Two were dismissed by local rule for failure

8   to file schedules.  The hinder and delay aspect of

9   those components, Your Honor, is present and really

10   what is required and the inference that the Court must

11   draw is that the activities of these principals and the

12   conduct of the parties also evidence an intent to

13   delay, to defer Access National Bank with respect to

14   the enforcement of its rights and remedies.

15            That, Your Honor, may be inferred from the

16   history of these parties and with respect to that, Your

17   Honor, I've cited you to the bankruptcy case out of the

18   Eastern District of New York, in re:  Montalvo at 416

19   BR 381.

20            Montalvo, Your Honor, is very conspicuously

21   similar to the case that you have before you today.

22   There were six separate bankruptcy filings, three by

23   the individual, three by his entity, some of which

24   occurred after the entity and the individual were no

25   longer in the chain of title but they nonetheless

Page 131

1   asserted that they were in the chain of title to effect

2   an automatic stay of a foreclosure.

3          All of them were filed either on the eve of

4   foreclosure or on the day of foreclosure and several of

5   them, Your Honor, and the history of the case as

6   recited by the Bankruptcy Court in its opinion, were

7   dismissed by local rule because either the debtor

8   Montalvo or his principal entity did not file required

9   filings to perfect the petition that had been placed

10   before the Court.

11          What the Eastern District of New York said,

12   Your Honor, was that the uncontroverted record of the

13   filings and the lack of any good faith prosecution of

14   the cases allows this Court to draw a permissible

15   inference and find that the incident petition was part

16   of a scheme to delay, hinder, and defraud HSBC.

17          HSBC was the creditor at that time.  You have

18   the same uncontroverted record before you, Your Honor,

19   the Amendolas have not come before you today and said

20   that there is anything incorrect about the history of

21   these proceedings.

22          And I would point out, Your Honor, that the

23   Bankruptcy Court in Montalvo said, "a lack of good

24   faith prosecution of the cases."  It doesn't matter

25   whether they were reorganizations or Chapter 7s.

Page 132

1          There must be an intent, when you place

2   yourself before this Court, not just to avail yourself

3   of the jurisdiction of this Court but to follow through

4   with the process that is afforded and the process that

5   is required of bankruptcy debtors to place themselves

6   before the jurisdiction of this Court.

7          The principals, Your Honor, the Amendolas

8   specifically and their entity Brevon Development have

9   wholly failed to do so.  Your Honor, this does rise to

10  the nature of an effort and a pattern of conduct to

11  delay, hinder, or defraud Access National Bank.

12         We believe that relief is appropriate under

13  (D)(4) and we ask the Court today to make that relief

14  binding as against any future filing of the property

15  for a period of one year.

16         We will also ask Your Honor that the Court

17  waive the 14 day stay under Rule 4001 so that Access

18  can begin and commence foreclosure proceedings

19  immediately and not be further delayed.

20         This is a case, Your Honor, where these

21  debtors have had the opportunity ad nauseam to deal

22  with the issues that exist between them and the bank.

23         The bank has tried more than necessary to meet

24  them more than halfway.  Last October, the bank thought

25  it had a deal.

Page 133

1          The Amendolas came in and said, "we've got a

2     source of money, we're going to help give you some

3     money."  The bank says, "great, but we're not going to

4     get caught in that same position."

5          So at that point in time, Your Honor, Exhibits

6     17 and 18 were signed and it is of particular moment

7     and importance that those documents were signed by each

8     and every one of the petitioning creditors, not just in

9     this case but in the prior case that was invoked

10    against RMAA claiming that the members themselves had

11    the authority to file and asserting that the entity was

12    a partnership.

13         Each and every one of those petitioning

14    creditors, Your Honor, agreed that RMAA would be

15    created and that Acme would be appointed as a manager

16    and that no bankruptcy could be filed without Acme's

17    consent.

18         Not just that it's a voluntary petition, Your

19    Honor, because that's --

20         THE COURT:  All right, I think I've heard

21    enough.

22         MR. O'DONNELL:  Okay.

23         THE COURT:  Mr. Forest, do you want to

24    respond?

25         MR. FOREST:  Yes.  Your Honor, I just want to

Page 134

1    address, I want to comment about the (D)(4) factors.

2    The statute says "delay, hinder, and defraud" and I

3    don't think that there's been anything presented to the

4    Court to show an effort to defraud Access.

5           Looking further down Section four it does, as

6    a part of the defraud it talks about transferring all

7    or part of the ownership of the property without

8    creditors or Court approval.

9           We haven't done that so I don't want to, I

10   just think that (D)(4) does not necessarily present

11   grounds for relief.  But to address and just to borrow

12   from Mr. O'Donnell's words he says that bad faith is

13   shown when there's no prosecution, when there's no

14   follow-through.

15          There's, I hesitate to say there's no evidence

16   that there wasn't any follow-through in the first

17   involuntary.  That was certainly dismissed and I don't

18   want to go too deep into that but I thought that there

19   was authority for that involuntary filing and I'll just

20   leave it right there because I know that's not before

21   this Court.

22          But I don't think it's appropriate for them to

23   say that there was no follow-through on that first case

24   when they moved to dismiss it.

25          I also don't think it's appropriate for them

1    to say there's no follow-through here when we're not

2    being given an opportunity to follow through.

3            I think the strongest evidence that I have to

4    factually distinguish our case and the history of the

5    Amendolas, from the cases that have been cited to the

6    Court and I'm not going to hide from it.

7            I wish that those other Chapter 7 proceedings

8    hadn't been filed but the most important point to

9    distinguish is that the Amendolas have paid

10   approximately $1,000,000 to Access National Bank

11   following all of that.

12           Mr. Amendola testified as to the approximately

13   $900,000.  I didn't write down the number but the

14   approximately $900,000 that was paid in the course of

15   2009.

16           He's testified that the principal balance

17   alone was curtailed by some $295,000.  He's testified

18   that following the August forbearance agreement that

19   they paid approximately $500,000 to Access National

20   Bank so this, when I say "this case" I mean the

21   circumstance here is one where RMAA may be foreclosed

22   from filing the involuntary petition because of the

23   language in there.

24           But where RMAA is basically coming, I don't

25   want to say helpless to the Court but coming to the

1    Court to try and get just a little bit of relief.

2              Now the little bit of relief that we need is

3    that -- and I use the term "we" -- that RMAA is having

4    incredible difficulty selling this property and they're

5    having difficulty because the purchasers that they deal

6    with are very sophisticated folks.

7              This is, don't try to be boastful here but

8    this is the largest house on the market in Loudoun

9    County and the kind of people who buy this like to

10   investigate things.

11             Invariably they come into contact with Access

12   National Bank and I don't mean to suggest any ill

13   intent on the part of the bank but the bank gives them

14   information as to what's going on and what the status

15   of things are.

16             And those folks who otherwise would have to

17   purchase the property through the Amendolas at what we

18   believe is a fair value and them starting to think, if

19   I just wait a little bit it will be on the market for

20   substantially less through a foreclosure.

21             So what RMAA needs is just a little bit of

22   breathing space.  I wish I could tell the Court that

23   RMAA could file a plan and consummate a sale within --

24   or file a plan within 90 days that shows the

25   probability of a sale being consummated.

1          I just don't know that I can do that.  But I

2     am comfortable that RMAA is going to be able to

3     effectuate a refinance of this loan and I don't

4     necessarily want to get into the hearsay issues.

5          And I'm not trying to reargue what Your Honor

6     has already ruled but I have comfort that -- I'm sorry,

7     I am comfortable that the folks at RMAA have at their

8     disposal a few hundred thousand dollars and I'm not

9     trying to be flippant when I say that, that can be used

10    to either curtail this note or that can be packaged in

11    as a part of a refinance.

12         Mr. Amendola has testified that the payoff

13    figure that was again, not admitted into evidence on

14    that letter of some number just well in excess of

15    reason, isn't the actual number that he's dealing with.

16         And what this really comes down to, Your

17    Honor, and unfortunately I think that this is the song

18    that the Court hears from every debtor is, give me a

19    chance.

20         And what we would propose, Your Honor, is just

21    to be given an opportunity to provide adequate

22    protection payments.  I know that Counsel suggests and

23    is vehement that there's no equity in the property.

24         And just to address the question of equity in

25    the property I would draw to the Court's attention that

1    we introduced evidence of the contracted $4.1 million.

2          And Mr. Shoemaker even outlined the break

3    points for the four various bidders and I'm sorry I

4    don't have the number committed to memory but the final

5    sale price that was knocked down was three-some million

6    dollars.

7          And I submit that it is, I don't want to call

8    it "incredible" but difficult to reconcile the fact

9    that a foreclosure sale would yield 50 percent more

10   than the appraised price that Mr. Ogden -- and I'm

11   sorry if I don't have his name correct -- came up with.

12         So Your Honor, our basic premise is if we can

13   have -- and I don't necessarily say breathing space to

14   come through with the sale because I'd like there to be

15   a sale but I can't promise that.

16         But what I am comfortable with is that if we

17   be allowed to make adequate protection payments we can

18   have this property refinanced in very short order.

19         Again, Mr. O'Donnell will say that there's no

20   way that's going to happen.  They owe so much more on

21   this second trust that it will just never work.

22         And again, the song that the Court always

23   hears but in this case is the Amendolas are willing to

24   dedicate, not personal assets because I don't know

25   where -- I have an understanding of where this money is

Page 139

1   coming from -- but if they're willing to put their

2   money where their mouth is and simply ask for nothing

3   more than an opportunity to do that.

4            And I know that the Court has discretion to

5   determine will final relief be granted to day and I

6   understand that that's a possibility that may happen.

7            But the Court, I know has also given debtors

8   an opportunity to try and reorganize it and we'd simply

9   like an opportunity to do that.

10           We're more than able to make the adequate

11   protection payments.  I'm not going to lay conditions

12   on it but I've pointed out that the note payment that

13   was originally called for in the note was at 16,000 and

14   some odd dollars.

15           I know the Amendolas had made higher payments

16   than that and if we're looking at adequate protection,

17   I had raised to the Court in my papers and even their

18   exhibit, the payoff statement shows the per diem

19   payment of $500 a day.

20           I can only assume that that equates to around

21   $15,000 a month in interest.  I'm sure it's a little

22   bit more but it comes very close to the $16,000 payment

23   that was set forth in the note.

24           I don't know exactly the interest rate that's

25   used to calculate that $500,000 and I don't want to

Page 140

1   burden the Court with it because if they say $509 is

2   the per diem then we can provide that adequate

3   protection.

4         But -- and I guess just to get back to the

5   issue of whether bad faith is cause under (D)(1).  I

6   don't think that I can argue that bad faith would be

7   cause under (D)() and again I wish we didn't have all

8   these prior bankruptcy filings, all these Chapter 7s.

9         But I think that those prior bankruptcy

10  filings, I would certainly hope would be washed clean

11  by a number of factors.  Again, the $1,000,000 that

12  they paid, the $1,000,000 that the bank accepted.

13        I don't suggest they waived their rights but

14  there's $1,000,000 that changed hands.  In the two

15  cases that Counsel cited there were not $1,000,000 that

16  were paid to -- and I don't suggest to make amends but

17  to try and bring things current.

18        And also the last two times that the bank

19  attempted -- I shouldn't say the last two.  The March

20  date, they voluntarily withdrew that.  They had every

21  right to be upset at that point and I shouldn't say

22  "upset" but they had every right to go forward.

23        They had demanded $104,000 and a contract.  We

24  provided $80,000 and a contract.  They had every right

25  at that moment to knock the sale down and proceed but

Page 141

1   they didn't do that.

2          Do I suggest that that's a waiver?  No.  But

3   I'm more relying on the fact that there was $80,000,

4   another $80,000 that was paid to try and keep this

5   project going.

6          And I would respectfully submit to Your Honor,

7   that the Amendolas wouldn't be here trying to rescue

8   this thing if they thought it was all a foregone

9   conclusion.

10          We just want an opportunity to make adequate

11   protection payments and I understand the Court can put

12   us on a very short leash but we would just like an

13   opportunity to do that.

14          THE COURT:  Did you want to add any closing

15   comments?

16          MR. O'DONNELL:  No, sir.

17          THE COURT:  All right, thank you.

18          Well, it goes without saying that whenever we

19   find a debtor and creditor, particularly banks that are

20   seeking to foreclose in this Court, that there's always

21   dismay, possibly shock that we're in this Court because

22   contractual relationships of the parties had

23   voluntarily entered into at the beginning of the

24   transaction have been frustrated.

25          Not because of the filing of the bankruptcy

1  but for other reasons and now they find themselves

2  seeking some authority to do something in the

3  Bankruptcy Court, perhaps to reorganize it to maximize

4  recovery out of the property.

5        So to the extent that the bank is disappointed

6  or something like that, that is pretty standard fare.

7  No one wants to lose money.  No one wants their

8  contract not to form and that includes the debtors.

9        But that's not the thing that runs or drives a

10  decision.  What I do think, though, that is significant

11  what Mr. O'Donnell started out with is the history of

12  this particular property and not just the frustration

13  of foreclosures that did not go forward but the manner

14  in which they did not go forward.

15        The one that did not go forward because of

16  agreement by the parties I think is neither a plus nor

17  minus to either side.  It was an effort to work things

18  out.

19        Both sides obviously thought that there was

20  some prospect.  That prospect was more valuable than

21  insisting upon the strict reading of their rights at

22  that time.

23        In those circumstances I can't hold that

24  either in favor of or against either party unless

25  there's some active fraud or misrepresentation which

Page 143

1  had not been shown.

2          But the difficulties with the prior bankruptcy

3  filings, and that's the difficulty with this.

4  Effectively this debtor has had more than a year or I

5  don't remember off the top of my head the date of the

6  first filing but it's approximately a year, I think,

7  something like that, of relief from the -- by the

8  bankruptcy code.

9          And in each instance the filing has delayed an

10  imminent foreclosure and by the time the filing is

11  cleared and the bank is ready to go forward again we

12  repeat the process.

13          In each instance there's no effort, successful

14  effort to reorganize or move the ball forward and I

15  think that that's the difficulty here.

16          The filing by Brevon, the guarantor is plainly

17  wrong.  That did not activate or implement the Section

18  362 stay.  They're a guarantor.  The Fourth Circuit

19  spoke about that in the early '90s, in re:  Jarris

20  where the fact that it may have consequences on a

21  guarantor does not mean that the automatic stay is

22  itself not implicated by that.

23          In that case Mr. Jarris was a guarantor of a

24  loan and another property was going to foreclosure and

25  questioned, just as the facts in this case and the

Page 144

1   Court of Appeals says that stay did not arise because a

2   guarantor files bankruptcy.

3        I can't see in mitigation on a Trustee, not a

4   bankruptcy Trustee but under a deed of trust you want a

5   fair and open sale.  You want no encumbrances or

6   clouds.

7        While I think that the law is clear on that,

8   that that is not a cloud he was uncertain of that at

9   that time and prudence suggests that he take another

10  look at it and there wasn't enough time for him to get

11  a thorough handle on these matters before he filed.

12       And as he said there could have been a

13  transfer of the property or something like that and the

14  issue is not as suggested here provide any evidence

15  that you filed because once you're put on notice of it,

16  the stay is effective immediately upon filing whether

17  you know about it or not.

18       And once one is put on notice one needs to

19  take some reasonable care to exercise some diligence to

20  satisfy himself that it is or is not and the timing of

21  the filing can frustrate that.

22       But it's the four of them altogether.  The

23  filing as a corporation is an interesting situation.

24  Judge Mitchell says you can't do it because it's not a

25  partnership, it's a corporation.

1          I understand that there's a certain amount of

2     duality of an LLC.  We'd like our cake and to eat it

3     too and basically we've gotten it with having a past

4     due tax entity with a corporate limitation of liability

5     and the parameters are not entirely clear on that.

6          But I think his decision was plainly right.

7     It is for purposes of bankruptcy code, not a

8     partnership and the ability of a general partner to

9     prevent a bankruptcy is different than a manager.

10          Although clearly because of the type of entity

11     there's some overlap.  I'm not sure if there are any

12     Court of Appeals decisions on that out of the Fourth

13     Circuit but I think the opinion was correct and it was

14     an improper filing.

15          I don't know that, I can't deduce from the

16     evidence presented that it was a bad faith filing

17     because of that.  I do see that the subsequent filing

18     is members as creditors.

19          That was not gone into here but that would

20     have been an interesting point to develop.  Maybe they

21     are admitted creditors and if that's the case they

22     should have filed as creditors the first time.

23          The possibility exists that they are not in

24     fact creditors and that they have concocted some sort

25     of loan and the petition should be dismissed for

1   whatever reason, for the reason that they're not the

2   proper creditors.

3          That hasn't been gone into but I do see the

4   sequence of the four, the timing of the foreclosures,

5   the relief that the debtor has obtained over this time,

6   and I think that that's a negative to start off with.

7          If this had been the first filing it would be

8   a different case altogether.  If there had been no

9   opportunity under bankruptcy to seek or try to

10  reorganize, that would be a different circumstance.

11         But effectively as a matter of practicality

12  there's been about a year's worth of relief under the

13  bankruptcy code but not in the manner in which it was

14  intended to be exercised.

15         The other issues of evidence that I think are

16  interesting to me and worthy of comment are Mr.

17  Harvill's indication of the auction at the March sale.

18         We haven't had enough evidence in enough cases

19  to understand appraisals as they are in the market

20  today.  In a normal fully functioning market the

21  appraisers and the profession and the manner in which

22  they go, I think give a very reliable indicator of

23  value.

24         The comps are the best indicator.  Those are

25  willing sales by willing, people willing to sell and a

Page 147

1   person willing to buy, neither under any compulsion and

2   the market is operating fully and completely.

3         And I think that there it's easy -- not

4   necessarily easy but it's pretty straightforward on how

5   to do it and the results are pretty reliable.

6         Here in the last couple of years, particularly

7   we saw it starting with the condos.  There was an

8   iconic photograph in the newspaper, the Washington Post

9   several years ago with, a park bench for lack of a

10  better term.

11        It wasn't a park.  It was probably a Metro bus

12  bench with about 18 lock boxes locked onto it for the

13  various condominium apartments in that particular

14  building.

15        That market is not working.  There's an

16  abundance of sales and they're just not selling and you

17  have to be careful about a circumstance where

18  properties are on the market and there are no sellers

19  because the market isn't working.

20        The second part of the market that is usually

21  is the top end because for practical reasons people

22  don't have the money to do it or in a situation that

23  we've had in the last year to 18 months, there are a

24  lot of lenders out there that are not making the loans

25  that might have been made otherwise.

Page 148

1          And that clearly depresses them.  They have

2    low interest rates but if you're not making loans for

3    these sorts of things you've got a double whammy.

4          People don't have the money, they don't have

5    the income.  The lenders aren't making the loans and

6    you have an indicator there that perhaps the market

7    isn't functioning.

8          So you need to take care with the appraisals

9    that are coming in.  Now this appraisal came in the

10   range of about the loan but what I find interesting is

11   that at the auction the bank bid its note and at that

12   point it stopped.

13          If it gets a dollar more it's out and that's

14   where it should stop for the benefit of its depositors

15   and its entity.  Its only interest is not to invest in

16   real estate but to get its money back and anyone who

17   bids a dollar over the total debt due is going to get

18   the property.

19          The second bidder who was a third party,

20   dropped out at $2.6 million, was Mr. Harvill's

21   testimony.  That is closer to the appraisal.  The next

22   builder was a subordinate lien holder who dropped out

23   at $3.3 million.

24          Well, his principal note was a million.  The

25   bank is owed $2.3 million and that's just about the

Page 149

1    right place for a second trust holder to drop out.

2          Once -- he's going to get his principal back.

3    If he wants to go forward he can go forward a little

4    bit more but at a dollar over that the first trust is

5    paid, he's got his money back, and whether it got any

6    interest in the past and he's willing to eat it, that's

7    his decision.

8          He could go higher and still get a bid paper

9    but it's interesting that it's about a million over

10   what the bank's bid was.

11         And then the third bidder is an insider and

12   it's easily concluded that that bid was to buy time

13   than to seriously intend to close on the contract

14   because that was by an LLC to be formed and one of the

15   numbers at least was an insider of this entity.

16         Why it didn't go to closing, whether it was

17   because the funding fell through or it was an intention

18   to buy time for basically an extension fee of the

19   deposit.  I don't know.

20         But when I look at those break points in the

21   bidding I think that they corroborate somewhat and

22   quite significantly the appraisal that came in today.

23         I do recognize that auctions are likely to be

24   depressed and the question obviously that would be

25   opened is to what extent?

Page 150

1           But I'm satisfied that the appraisal is

2   substantially correct, based on what we've had.  It

3   might, in today's market that's what may well come if

4   the market recovers but it takes time to recover.

5           The value may still be there and the idea of

6   it is, looking at the flash crash that we had a few

7   months ago on the stock market, for a few hours the

8   market was really down and there was a lot of stock

9   that had lost 80 or 90 percent of the value.

10          Well, it really hadn't.  The true value, if

11  you looked at the book and the business of these

12  entities was still there but something happened and the

13  market froze up and there was a break in the market

14  which resulted in that.

15          The stock market can recover as it did, within

16  hours.  The real estate market in these cases takes

17  quite a bit longer to do it so you deal with the

18  concept of what is it's real value versus what you can

19  get today.

20          Well, what you can get today is probably the

21  real value certainly today but the condition of the

22  market and those things certainly has an impact on it

23  and people's perception of what the house is worth and

24  how they would finance it to come in.

25          But I look at that testimony and I think that

Page 151

1    we really do come to a reasonably understood valuation

2    of the property, tested by the market.  Certainly a

3    depressed auction market is out there.

4            But the testimony is that or the suggestion at

5    least, the argument and some testimony is that this

6    house isn't going to sell well because it can be bought

7    at auction, that foreclosure will at least lessen it's

8    worth.

9            Well, it was put up and that market was tested

10   and that's what it came in to be.  I don't know that

11   anyone out there would expect it to be significantly

12   different than that.

13           So I think that that's where you get the value

14   that is there.  There was very brief testimony as to,

15   and the question I had is, well, you've had a year.

16   What are you going to do in the next few months?

17           Why hasn't there been refinancing?  And the

18   testimony by the debtor's representative was quite

19   plainly that we were unsuccessful in trying to

20   refinance over the last year.

21           And there's no indication of why things have

22   changed, that if I were to give more time whether it a

23   week, a month, or six months that the refinancing that

24   could not have been and was not effected in the last

25   year would be effected now.

Page 152

1           I recognize that the four individuals or at

2    least three -- one I think has been discharged from

3    bankruptcy -- have guarantees outstanding and I think

4    that that's the motivating effort to keep this in here,

5    is to minimize the exposure on the guarantors.

6           But they've had a year to come up with their

7    own money, to come up their own refinancing, or

8    whatever other mechanism necessary that they now seek

9    to achieve in a Chapter 11 and a year is sufficient

10   time for that.

11          So basically what I'm looking at is, there's

12   been a year worth of effort or a year worth of a

13   possible effort which did not come to fruition.  I see

14   no significant changes going forward and I see the

15   likelihood of reorganization in these circumstances to

16   be remote and unlikely.

17          I am concerned about the contract.  Of course

18   it did not go to fruition.  It was with a realtor and I

19   don't know that, from the realtor whether it was from

20   her personal use to flip it, whether she had someone

21   she thought would buy it.

22          I don't know what the circumstances are but it

23   did effect for a fee, a further delay in the

24   foreclosure that gave an opportunity to market it

25   again.

Page 153

1          So I'm not sure what that means but the

2    contract clearly did not come to fruition and while it

3    was written, it was signed, it was sealed, it went no

4    further than that.

5          So notwithstanding that there have been people

6    who have discussed it none of those offers have

7    resulted in contracts and I don't think that there's a

8    likelihood of recovery.

9          I do think there's bad faith because of the

10   nature of the manner in which this has been handled

11   from the beginning and the inappropriate way.  As I

12   said if this had been at least a Chapter 11 at the

13   beginning as Mr. Forest suggested it would be nice to

14   have had this, the first one.

15         You probably would have gotten a reasonable

16   period of time to attempt to reorganize.  I think

17   you've had that opportunity albeit in a back door way

18   of doing it.

19         It is true, Mr. O'Donnell, I think that (D)(4)

20   is in the conjunctive.  If you compare that to the

21   fraudulent conveyance which is in the disjunctive I

22   think it is quite plain.

23         If it were in the disjunctive I don't have any

24   question but for the fact that it would be applicable

25   here because the effect of these serial filings has

Page 154

1   been to delay the inevitable foreclosure.

2          But nonetheless I do have the authority under

3   105(a) to impose the same sanction on the property and

4   I will do so.  I think this is a case where a

5   bankruptcy is no longer the right forum for this.

6          And whatever the parties non-bankruptcy

7   contractual rights or remedies are is where the parties

8   should be focusing their attention on.

9          Bankruptcy Court has been used, I think

10  misused but however it happened you got the benefits of

11  a years' worth of bankruptcy and I think that that's

12  about all that we should do in these particular

13  circumstances.

14         I will grant the motion for relief from stay.

15  It will be an in rem order for one year that with any

16  bankruptcy stay not affecting this particular property.

17         I note in that that although there are

18  provisions for a second and third filing and of how

19  they effected an automatic stay they're directed toward

20  those instances, principal and individuals.

21         When an individual files a second or third

22  filing within a year or the spouse does, effectively we

23  have the same thing although we're not within the same

24  family relationship.

25         But all of these parties who have filed are

Page 155

1   related and I think that the same intent and purposes

2   of those provisions that deal with individuals that are

3   affected and the circumstances in which we find

4   ourselves here today.

5          I respect the fact that this was brought on an

6   expedited basis and Mr. Forest, you were not able to

7   get another appraisal.  Your proffer of a two year old

8   appraisal is $5.2 million, is well worth proffering to

9   the Court and as you properly note I can't accept it

10  because it's way out of date.

11         I also note the testimony of the debtor,

12  although Mr. O'Donnell interrupted him before he got

13  too far which was that they have effected a tax

14  assessment readjustment downward because of the change.

15         But we know that the properties have decreased

16  in value over the last two years and it's just across

17  the board, and these are the top end so that is another

18  indicator that it's lower than the $5.2 million and the

19  question is how much lower.

20         But I don't think that giving you more time

21  would bring you into enough to satisfy all the debts

22  and you'd still need something else to do that.

23         And I think that, I can't think of any

24  evidence that you could present at this point that

25  would, if I gave you time to prepare further that would

1    be productive in the case and that's one of the reasons

2    I'll grant the relief today.

3              (Whereupon, at 5:15 p.m. the proceedings were

4    concluded.)

5

6                          *   *   *   *   *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25